HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Phone: (415) 433-1700
Fax: (415) 520-6593

JAKE M. VOLLEBREGT (SBN: 261465)
jmv@vollebregt.law
VOLLEBREGT LAW CORPORATION
120 Vantis Drive, Suite 300
Aliso Viejo, California 92656
Phone: (949) 528-6401
Fax: (949) 528-6402

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PROFESSIONAL BEAUTY FEDERATION OF CALIFORNIA**, a California Corporation; **CORINNE LAM**, a California Resident; **P2W LEARNING SYSTEMS, LLC**, a Delaware Limited Liability Company; **RONOR LEASING INC.**, a California Corporation; **ZENBI SALONS, INC.**, a California Corporation; and; **ROSE IBARRA**, a California Resident;<br><br>        Plaintiffs,<br><br>      v. | Case Number: 2:20-cv-04275<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>1) **14th AMENDMENT DUE PROCESS**<br>2) **14TH AMENDMENT EQUAL PROTECTION**<br>3) **5TH AMENDMENT TAKINGS**<br>4) **CAL. CONST. ART. 1 § 1 RIGHT TO LIBERTY** |

1



Complaint                                                                                          Case No.

**GAVIN NEWSOM**, in his official capacity as the Governor of California; **XAVIER BECERRA**, in his official capacity as the Attorney General of California; **SONIA ANGELL**, in her official capacity as California Public Health Officer and Department of Public Health Director; **LOURDES CASTRO RAMIREZ**, in her official capacity as Secretary of the California Business, Consumer Services and Housing Agency; **KIMBERLY KIRCHMEYER**, in her official capacity as Director of the Department of Consumer Affairs; **KRISTY UNDERWOOD**, in her official capacity as Executive Officer of the State Board of Barbering and Cosmetology; **JACQUELYN CRABTREE**, in her official capacity as member of the State Board of Barbering and Cosmetology; **ANDREW DRABKIN**, in his official capacity as member of the State Board of Barbering and Cosmetology; **DERICK MATOS**, in his official capacity as member of the State Board of Barbering and Cosmetology; **CALIMAY PHAM**, in her official capacity as member of the State Board of Barbering and Cosmetology; **LISA THONG**, in her official capacity as member of the State Board of Barbering and Cosmetology; **CHRISTIE TRAN**, in her official capacity as member of the State Board of Barbering and Cosmetology; **STEVE WEEKS**, in his official capacity as member of the State Board of Barbering and Cosmetology; and **KARI WILLIAMS**, in her official capacity as

5) **CAL. CONST. ART. 1 § 7 RIGHT TO PROPERTY**
6) **CAL. CONST. ART. 1 § 19 TAKINGS WITHOUT COMPENSATION**

2



Complaint
Case No.

member of the State Board of Barbering
and Cosmetology;

            Defendants.

# INTRODUCTION

        More than two months have passed since Governor Newsom proclaimed a state
of emergency in California, and throughout that time, he and others in his
administration have vaguely and arbitrarily classified licensed barbering and
cosmetology professionals as "non-essential," criminalizing the jobs these 500,000 plus
state-licensed professionals perform in every community, large and small, throughout
California. Last week, Defendants began threatening to revoke Plaintiffs' licenses,
which authorize them to safely serve the public's personal grooming and beauty needs,
and embody their ability to earn a living.

        If allowed to stand, Defendants' arbitrary orders will continue to violate
Plaintiffs' fundamental rights, inflicting irreversible financial and personal harm to
more than 500,000 licensed beauty professionals in California. They have offered no
exceptions, and identified no future date for reinstatement of these lawful professions.
In doing so, Defendants overstep the authority entrusted to them by the California
Constitution, and violate Plaintiffs' rights to due process. Plaintiffs hereby request that
this Court provide narrow but appropriate relief to ensure the Governor has adequate
latitude to address the COVID emergency, while also respecting Plaintiffs' fundamental
rights guaranteed by the constitutions of the United States and the State of California.

## NATURE OF THE ACTION

        1.      In response to the coronavirus emergency, Defendants are depriving
Plaintiffs, their members, employees, tenants, and students of fundamental rights

Complaint                                                                    Case No.

protected by the United States and California constitutions, including due process, equal protection under the law, the rights to liberty, and just compensation for takings.

2.      This action presents facial and as-applied challenges to Governor Newsom's March 19, 2020 Executive Order N-33-20 (the "Governor's Order") attached hereto as Exhibit 1 and incorporated herein by this reference. The Governor's Order has no sunset provision or expiration date. The legislature is in session and has scaled back its agenda to focus on matters related to the COVID-19 crisis.[1] The Governor nevertheless continues to use the emergency to exercise unlimited power over Plaintiffs, having declared their professions, without evidence or due process, as "non-essential," and therefore prohibited, subject to criminal prosecution and license revocation. The Governor's Order and other related directives may at times be referred to collectively as the "Orders" in this Complaint.[2]

## PARTIES

1.      Plaintiff Professional Beauty Federation of California ("Federation") is a California Corporation with its principal place of business in Auburn, California. It is a nonprofit membership organization representing licensed beauty professionals in California. The Federation serves as a voice for the more than 500,000 licensees in all sectors of the beauty and barbering industries, including hair, skin, nail care, electrolysis, and beauty colleges.

2.      Plaintiff Corinne Lam ("Lam") is an individual and resident of San Diego County, California. She holds an individual license to practice as a cosmetologist. The Board issued License No. 455886 to her on August 25, 2005. At all relevant times, she

---

[1] President Pro Tempore Atkins' Memo to Senate Standing Policy Committee Chairs, April 10, 2020.
[2] As of the date of this filing, the Governor's Order may be accessed online at the following URL: Governor's Order: https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf.



Complaint                                                                Case No.

is and was a resident of California and is a professional hairstylist at Salotto Salon & Blowdry Lounge in San Diego. She is also an officer and shareholder of Plaintiff Zenbi Salons, Inc.

3.     Plaintiff P2W Learning Systems, LLC, d/b/a "Paul Mitchell The School, Sherman Oaks" ("Paul Mitchell") is a limited liability company formed under the laws of Delaware with its principal place of business in Sherman Oaks, California. The Board issued School of Cosmetology License No. 6028 to Paul Mitchell on November 7, 2006. Paul Mitchell operates its beauty school at the Sherman Oaks Galleria.

4.     Plaintiff Ronor Leasing Inc. d/b/a "Social Salon Suites" ("Salon Suites") is a California Corporation with its principal place of business in Glendale, California. Rose Ibarra, and her spouse Norbert Ibarra, serve as officers of Salon Suites.

5.     Plaintiff Zenbi Salons, Inc. ("Zenbi") is a California Corporation with its principal place of business in San Diego, California. The Board issued establishment License No. 266850 to Zenbi on June 3, 2010. Zenbi owns and operates the Salotto Salon & Blowdry Lounge in San Diego, California.

6.     Plaintiff Rose Ibarra ("Ibarra") is an individual and resident of California. The California Board of Barbering and Cosmetology ("the Board") issued License No. 360595 to her on September 29, 1998. Ibarra has a personal hairstyling business in Los Angeles County and is an officer and shareholder of Plaintiff Ronor Leasing Inc.

7.     Defendant Gavin Newsom is made a party to this action in his official capacity as the Governor of California. The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. Art. V, § 1. Governor Newsom issued the Governor's Order on March 19, 2020.

8.     Defendant Xavier Becerra is made a party to this action in his official capacity as the Attorney General of California. Under California law, Becerra is the chief law enforcement officer with supervision over all sheriffs in the State. California Const. Art. V, § 13.



Complaint                                                                                    Case No.

9.      Defendant Sonia Angell is made a party to this action in her official capacity as California State Public Health Officer. Angell is sued herein in her official capacity to challenge the constitutionality of her office's list of "Essential Critical Infrastructure Workers" issued to complement Newsom's Executive Order.[3] This list was issued on or about March 22, 2020 and updated on or about April 28, 2020. It is attached hereto as Exhibit 2 and incorporated herein by this reference.

10.      Defendant Lourdes Castro Ramirez is made a party to this action in her official capacity as Secretary of the California Business, Consumer Services and Housing Agency, which oversees the Department of Consumer Affairs ("DCA") and the California Board of Barbering and Cosmetology ("the Board").

11.      Defendant Kimberly Kirchmeyer is made a party to this action in her official capacity as Director of the DCA, a division of the State Business, Consumer Services, and Housing Agency. The DCA administratively oversees the Board.

12.      Defendant Kristy Underwood is made a party to this action in her official capacity as Executive Officer of the Board a subdivision of the DCA.

13.      Defendants Jacquelyn Crabtree, Andrew Drabkin, Derick Matos, Calimay Phan, Lisa Thong, Christie Tran, Steve Weeks, and Kari Williams are each made parties to this action in their respective official capacities as members of the Board, a subdivision of the DCA. The Board of Barbering and Cosmetology is governed by Division 3, Chapter 10 (Section 7301, *et seq*.) of the California Business & Professions Code.

14.      Each Defendant has acted and continues to act under color of state law with respect to all acts or omissions herein alleged.

---

[3] Available as of May 10, 2020, at:
https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf.



Complaint                                                                                          Case No.

**JURISDICTION AND VENUE**

15.     This action is brought under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiffs' constitutional rights to due process, equal protection, and just compensation for temporary takings under the Fifth and Fourteenth amendments to the U.S. Constitution.

16.     Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

17.     This Court has supplemental jurisdiction over the claims asserted under California's Constitution, statutes, and regulations.

18.     The Central District of California is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is a District in which Defendants maintain offices, exercise their authority in their official capacities, have enforced, and have threatened to enforce the Orders.

**FACTUAL ALLEGATIONS**

19.     On or about January 31, 2020, the U.S. Secretary of Health and Human Services declared a public health emergency, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID-19.

20.     On or about March 4, 2020, California Governor Gavin Newsom proclaimed a State of Emergency as a result of the potential threat of COVID-19.[4]

---

[4] As of the date of this filing, the Proclamation of a State of Emergency can be found online at: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.



Complaint                                                                    Case No.

21.     On or about March 13, 2020, President Donald J. Trump proclaimed a National State of Emergency as a result of the threat of the emergence of a novel coronavirus, SARS-CoV-2, which causes the COVID-19 illness.[5]

22.     On March 19, 2020, Governor Newsom issued Executive Order N-33-20, attached hereto as Exhibit 1, directing all residents to heed the State Public Health Officer's directives.

23.     Plaintiffs Ibarra, Lam, Paul Mitchell, Salon Suites, and Zenbi, have ceased licensed operations and have had no income from their respective Board-licensed activities in the beauty professions since the Defendants issued the Orders.

## ARBITRARY CATEGORIES
## OF "ESSENTIAL" AND "NON-ESSENTIAL" SERVICES

24.     The Governor's Order, by reference, incorporated the U.S. government's "16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof" such that Newsom ordered that "Californians working in these 16 critical infrastructure sectors continue their work because of the importance of these sectors to Californians' health and well-being."[6]

25.     On or about March 22, 2020, Defendant Angell in her capacity as California Public Health Officer designated a list of "Essential Critical Infrastructure Workers"[7] attached as Exhibit 2. The list was updated on April 28, 2020.

_____

[5] As of the date of this filing, the Proclamation of a National Emergency can be found online at: https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.
[6] See, supra, n.2.
[7] As of the date of this filing, the list of Essential Critical Infrastructure Workers can be found online at: https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf.



Complaint                                                                 Case No.

26.     The Order allows persons to continue working only if they are deemed "essential workers" in an "essential business."[8] While some of the deemed-essential businesses are clearly critical to human needs despite an emergency (e.g., public safety, food supply chain, utilities), others, when viewed in the light of the prohibitions against Plaintiffs, are arbitrary as they bear no connection to public health and have been created for the sole purpose of allowing Defendants' politically preferred trades and industries to continue operating while secondary interests are left in economic distress. The State Public Health Officer's Directive[9] (herein as "List") includes the following as "essential":

    a.  "Workers supporting the entertainment industries, studios, and other related establishments, provided they follow COVID-19 public health guidance around physical distancing." Licensees supporting the entertainment industries as beauticians, hair stylists, and manicurists at a film studio are "essential," while Plaintiffs' licensed services to clients outside the entertainment industry are not. This distinction bears no connection whatsoever to public health.

    b.  "Workers for health manufacturing … and distributors of … cleaning, sanitizing, disinfecting or sterilization supplies, personal hygiene products, and tissue and paper towel products" as "essential." Plaintiffs and other licensees provide these services, sell shampoo, as well as other hygiene products. While Plaintiffs are essential for selling of shampoo, they are deemed non-essential when it comes to the licensed services. Plaintiffs at least partially fall within the "essential" services exception list, yet

---

[8] Exhibit 1.

[9] As of May 9, 2020, located at: https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf, and attached as Exhibit 2.

9



Complaint                                                                                        Case No.

Defendants' threat to revoke Plaintiffs' licenses for practicing licensed activities underscores the irrational, arbitrary and capricious nature of the Governor's Order and Defendant's enforcement.

c.  **"Workers performing services in support of the elderly and disabled populations who coordinate a variety of services, including health care appointments and activities of daily living" are deemed essential. Personal grooming services, including those offered by Plaintiffs, are central to the daily lives of the elderly and disabled. However, Defendants nevertheless deny Plaintiffs and other licensees the ability to perform these services under threat of criminal prosecution and license revocation.

d.  Workers in laundromats, laundry services, and dry cleaners come in close, direct contact with the clothing and linens from members of the public, with no temporal limitation. These items which, if a customer is infected with COVID-19, pose as high a risk, if not greater, of infection as Plaintiffs' licensed activities.

27.  Accordingly, Governor Newsom's "essential workers" list prohibits all workers in the hair, skin, nail care, and electrolysis industries from engaging in their profession, regardless of the measures taken by these professionals to reduce or eliminate the risk of the virus spreading. Meanwhile, the List deems the continuity of services provided by espresso bars, recreational cannabis dispensaries, pet grooming, chiropractors, and other professions to be so essential to "public infrastructure" that these activities are permitted to resume under the Governor's Order, despite posing the same or greater risks than Plaintiffs' licensed activities.

28.  The State Public Health Officer's directives require, in part, "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical



Complaint                                                                                          Case No.

infrastructure sectors".[10] The public health directive provides that its directives "shall stay in effect until further notice."[11] The Governor's Order and its public health directives, which was the first such "stay-at-home" directive issued in the country, provides that it "shall stay in effect until further notice." Thus, without giving any benchmarks or standards to determine when the proclaimed emergency is over, the Governor's Order grants State actors the limitless power to create arbitrary standards and capriciously enforce them in perpetuity, or "until further notice." Indeed, Governor Newsom has indicated in various public remarks that living under his emergency orders is the "new normal" for 12-18 months into the foreseeable future, certainly into next year.[12] Governor Newsom has indicated that the prospect of large gatherings and other elements of "normalcy" will not be considered until the population has achieved herd immunity and a vaccine is available, which may occur in 12-18 months.[13] Anticipating that the emergency will persist past the November 2020 election, Governor Newsom unilaterally—without any action by the legislature—changed the State's voting rules by directing that all of the State's voters be registered to vote-by-mail.[14]

     29.    After being lobbied by the United Cannabis Business Association,[15] Governor Newsom and Dr. Angell made arbitrary exceptions, amending their original

---

[10]The State Public Health Directive was included in the text of Executive Order N-33-20.

[11] *Id.*

[12] Press Briefing, April 14, 2020 at 29:55-36:55, accessible May 11, 2020: https://www.youtube.com/watch?v=wQW0QGthFV4 ("As I said, normal, it will not be, at least until we have herd immunity and we have a vaccine…which means they have to redesign those businesses… if we build that workforce to help us with tracing… hundreds of thousands of points of contact in terms of our tracing capacity.")

[13] *Id.*

[14] Executive Order N-64-20, May 8, 2020.

[15] See, e.g., https://www.wsj.com/articles/california-deems-pot-an-essential-coronavirus-business-11585005903 (last visited on May 10, 2020).

11



Complaint                                        Case No.

List to declare that cannabis retail stores were "essential" after while maintaining that Plaintiffs' licensed activities are "non-essential." Rather than providing guidance on how to resume operations as "essential" businesses in a manner that protects public health, Defendants now instruct Plaintiffs to seek assistance from their "industry association" for appropriate relief, bypassing decades-old administrative hearing and legislative controls that would otherwise ensure due process. Instead of due process and compelling matters of public health, determinations of "essential" and "non-essential" are handled through an opaque process of lobbying by special interests, unilateral decrees made on the fly, and no opportunity to appeal or be heard.

30.     None of the powers expressly granted under the California State Emergency Services Act allow Governor Newsom to sequester all Californians within their homes indefinitely, unable to ply their trades or provide for their families legally.[16]

31.     Since the initial outbreak of COVID-19 in the United States in February and March 2020, the federal government's projections of the anticipated national death toll related to the virus have decreased substantially, by orders of magnitude. Despite these developments, the Defendants have imposed increasingly stringent restrictions— and in some cases banning—Plaintiffs' licensed activities, while allowing individuals in other classes and groups to perform similar activities that pose equal or greater risks to public health.[17]

**THREATENED LICENSE REVOCATIONS**

32.     For nearly two months, California officials have threatened criminal prosecution for violations of the Governor's Order. Defendants have effectively taken away Plaintiffs' lawful right to engage in professional state-licensed activities. This has

---

[16] Cal. Gov't Code § 8565, et seq.
[17] See, e.g.,
https://www.usatoday.com/story/news/investigations/2020/04/09/coronavirus-deaths-u-s-could-closer-60-k-new-model-shows/5122467002/



Complaint                                                                                           Case No.

forced Plaintiffs to lay off employees, forego their property, lose their livelihoods, and risk financial ruin, all without due process of law.

33.     As of February 2020, the State Board licenses 313,734 stylists and cosmetologists, 34,093 barbers, 90,392 estheticians, 129,802 manicurists, 1,679 electrologists, and 53,694 establishments.

34.     As counties within California and other states make plans to reopen their economies with specific safeguards, Defendants have threatened to revoke licenses of cosmetology professionals without any permission or explanation as to how to carry on their professions in compliance with the "new normal" decreed by Defendants.

35.     Defendants' actions have resulted in the *de facto* revocation of hundreds of thousands of licenses throughout California, depriving licensees, including Plaintiffs, of all economically and personally beneficial use of them in complete disregard of applicable law. This was based on an arbitrary determination that their businesses are "non-essential."

## THREATENED DISCIPLINARY ACTION

36.     Last week, Defendants escalated their threats. Now, Defendants threaten Plaintiffs and other licensees with expulsion from their profession if they do not keep their businesses closed, while "essential" workers and businesses resume operations. Individuals requesting guidance or relief are directed to seek assistance from their "industry associations."

37.     On May 1, 2020, the Board issued a notice directing all license-holders to, in part, "abide by the Governor's stay at home order," threatening that businesses that do not follow the Governor's Order will be subject to "disciplinary action against their license" and that "[violations] will not be taken lightly" (the "Board's Directive"). The only legal authority cited in the Board's Directive was the Governor's Order, stating, "[T]he Board fully supports the Governor's stay at home order and we expect our licensees to comply." A copy of the Board's Directive is attached hereto as Exhibit 3 and incorporated herein by this reference.



Complaint                                                                                    Case No.

38.     This legal challenge seeks to curtail the Defendants' overly broad and arbitrary orders and restore Plaintiffs' rights to conduct their professions with appropriate and specific safeguards against the COVID-19 illness. Plaintiffs represent licensees who have been devastated by Defendants' arbitrary and unclear categories (*e.g.* "essential" versus "non-essential") that allow some businesses to operate while others are required to close. Plaintiffs have asked Defendants what they can do to resume their professions safely, only to be rebuffed. This unilateral reordering of the economy is occurring without any legislative or electoral oversight. It also exceeds the widely-recognized limitations on government authority under the United States Constitution and California law.

39.     Plaintiffs and other licensees are well-versed in the latest practices of health, safety, sanitation, and hygiene required preventing the spread of contagion. The Board restricts entry to the examination to those applicants who have completed all the required hours for their field of study. Stylists and cosmetologists are required to complete 1,600 hours of training. Barbers are required to complete 1,500 hours of training. Estheticians are required to complete 600 hours of training. Electrologists are required to complete 600 hours of training. Manicurists are required to complete 350 hours of training. Most of the required training consists of safety, hygiene, and sanitation protocols. Licensed training programs, including Paul Mitchell, include comprehensive health and safety measures. As an example, the attached syllabus from Bellus Academy, a licensed beauty college, is attached hereto as Exhibit 4 and incorporated herein by this reference.

40.     Besides the vigorous training described above, Licensees are also subject to regular inspections and ongoing scrutiny for safety, cleanliness, and sanitation practices. The Board's Health & Safety Regulations are attached hereto as Exhibit 5 and incorporated herein by this reference.



Complaint                                                                                   Case No.

## DEPRIVATION OF REAL AND PERSONAL PROPERTY

41.    Federation's members hold licenses issued by the Board. They have been denied use of these licenses and other property, both real and personal, since the Governor's order was issued. They nevertheless remain liable for licensing fees and other fixed operating costs. On May 5, 2020, the Board directed Plaintiff Lam to seek assistance from her "industrial association." Federation is a nonprofit "industrial association."

42.    Ibarra practices as a freelance hairstylist at various licensed establishments in the Los Angeles area in California. Ibarra has been denied the use of her license since the Governor's Order was issued. As a consequence, Ibarra has been without income since the Governor's Order was issued. Ibarra nevertheless remains liable for annual licensing fees and other fixed operating costs to sustain her profession and livelihood as a licensed cosmetologist.

43.    Salon Suites and its tenants have been denied the use of their real property, licenses, and other personal property by Defendants. Salon Suites maintains and subleases 19 hairdressing and cosmetology suites at its leased premises at 540 W. Colorado Street in Glendale, California. Of these 19 suites 17 are leased by tenants. As officers of Salon Suites, Rose Ibarra and her spouse Norbert Ibarra are responsible for the operation and maintenance of the premises in support of Salon Suites' tenants. All Salon Suites' cosmetology tenants have licenses issued by the Board. These tenants have been denied use of their leased real property, licenses, and other personal property since the Governor's Order was issued. Salon Suites has granted a forbearance of rent to its tenants until such time as they might resume operations when the Governor's Order is lifted. As a consequence, Salon Suites and their tenants have been without income since the Governor's Order was issued. Salon Suites and its tenants nevertheless remain liable for monthly rental payments for leased real property, licensing fees, and other fixed operating costs exceeding $18,000 per month.



Complaint                                                                                                   Case No.

44.     Lam and Zenbi have been denied the use of their real property, licenses, and other personal property by Defendants. As a consequence, Zenbi, Lam, her family, and the Salon's employees have been without income from the salon since the Governor's Order was issued. All of their employees have been furloughed. Zenbi's salon has ten employees, all of whom are now on furlough. It has an exclusive leasehold interest in and continues to pay rent for premises at 16935 W. Bernardo Drive, Suite 185, in San Diego. Zenbi has been denied the use of its license as well as its real and personal property since Defendants issued the Orders. Lam and Zenbi nevertheless remain liable for rent on real property, licensing fees, and fixed operating costs of more than $5,000 per month.

45.     Paul Mitchell, its employees, and their students have been denied the use of their real property, licenses, and other personal property by Defendants since the Governor's Order was issued. Paul Mitchell leases premises at the Galleria but has been denied use of this real property due to the Defendants' actions. Paul Mitchell employs approximately 33 instructors, 17 of whom are cosmetology licensees. Most of these employees are now on furlough due to Defendants' actions. Prior to the Governor's Order, Paul Mitchell had an enrollment of 230 students, all of whom were working towards the Board's requirements for becoming licensed cosmetologists. Paul Mitchell nevertheless remains liable for leased real property, licensing fees, and other fixed operating costs of more than $60,000 per month.

46.     Prior to ceasing operations at Salotto Salon, Plaintiffs Lam and Zenbi took appropriate steps consistent with emerging techniques, Centers for Disease Control Guidelines, and their license requirements, including without limitation, making physical alterations to the salon to accommodate social distancing, eliminating indoor waiting areas, incorporating touch-free check-in, check-out, and payment processing, and all other safety measures they could identify in order to match safety guidelines "essential" businesses have been using in their operations.



Complaint                                                                                  Case No.

47.     On May 2, 2020, Plaintiff Lam sent correspondence to the Board requesting guidance on reopening. On May 4, 2020, the Board responded with no guidance other than direction to consult with their "industry association for additional guidance during this time." The Board offered no process or means to resume operations as a licensee. Lam's correspondence with the Board is attached hereto as Exhibit 6 and incorporated herein by this reference.

48.     Instead of promulgating conditions or guidelines for the safe practice of these licensed activities as the Centers for Disease Control and counterparts in neighboring states have, Defendants have categorically labelled Plaintiffs' industry "non-essential," thereby conscripting Plaintiffs and other licensees to joblessness and taking their property without due process or legal justification.

49.     Plaintiffs do not have adverse disciplinary history with the Board.

50.     Plaintiffs have not contracted COVID-19. They are not aware of coming into contact with anyone with COVID-19.

51.     Not one of the licensees or other personnel operating at Plaintiffs' facilities has contracted COVID-19 nor, to their knowledge, been exposed thereto.

## FEDERAL MONITORING OF CIVIL RIGHTS VIOLATIONS

52.     On April 27, 2020, Attorney General William Barr sent a memorandum to all U.S. Department of Justice United States Attorneys regarding civil rights violations occurring in various states during the coronavirus crisis.[18] This memorandum is attached hereto as Exhibit 7 and incorporated herein by this reference.

53.     In his memorandum, Attorney General Barr directs all United States Attorneys to identify state directives that could be violating the Constitutional rights and civil liberties of individual citizens, stating "the Constitution is not suspended in times of crisis." Attorney General Barr wrote,

---

[18] As of May 10, 2020, accessible at: https://cdn.cnsnews.com/attachment/ag_memo_-_balancing_public_safety_with_the_preservation_of_civil_rights_0.pdf



17

Complaint                                                                    Case No.

> "If a state or local ordinance crosses the line from an appropriate exercise of authority to stop the spread of COVID-19 into an overbearing infringement of constitutional and statutory protections, the Department of Justice may have an obligation to address that overreach in federal court."

54.     Defendants have abused their power by seizing on the coronavirus pandemic to expand their authority to lengths unprecedented by any prior crisis in California, including prior natural disasters, wars, and economic crises. This legal action challenges the very type of overbearing infringement of constitutional and statutory protections identified by Attorney General Barr.

### UNCONSTITUTIONALLY VAGUE "PATHS TO REOPENING"

55.     On May 4, 2020, Governor Newsom issued Executive Order N-60-20 concerning the second and third stages of California's "four-stage framework . . . to allow Californians to gradually resume various activities" ("The Governor's Reopening Order"). The Governor's Reopening Order directed the State Public Health Officer to "establish criteria and procedures … to determine whether and how particular local jurisdictions may implement public health measures that depart from the statewide directives," specifically "measures less restrictive than any public health measures implemented on a statewide basis."

56.     The Governor's Reopening Order also states that it should not be "construed to limit the *existing authority* of local health officers" to adopt "more restrictive" or "addition[al]" measures" (emphasis added). Under existing law, "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const. art. XI, § 7 (emphasis added). And when, as here, the Governor exercises the State's "police power" during a state of emergency, the Governor's "orders and regulations shall have the force and effect of law." Cal. Gov't Code §§ 8567, 8627.



Complaint                                                                    Case No.

57.     The Governor's Reopening Order only allows counties to act within their "existing authority"—that is, to adopt measures that are consistent with or more stringent than the Governor's orders or that address matters on which the Governor's orders are silent.

## ENFORCEMENT IS ARBITRARY AND CAPRICIOUS, AND WITHOUT RATIONAL BASIS

58.     At a press conference on March 19, 2020, Newsom repeatedly said the rationale for the Governor's Order was to "bend the curve."[19] He also said "[t]he point of the stay at home order is to make those numbers moot"[20] and put them "in the dustbin of history."[21] He added that one goal was to slow down transmission enough to reduce the strain it might place on hospital resources.[22] Indeed, the strain on hospital resources *was* a key factual foundation of the emergency proclamation of March 4, 2020.[23] It is this legitimate albeit temporary goal of "bending the curve," that Newsom has dismissed in favor of ever-shifting and undefined policy goals, ever beyond the reach of California's residents.

59.     At the outset of the COVID-19 crisis, Governor Newsom wrote in a letter to President Trump[24] stating that in eight weeks, by May 13, 2020, approximately 56%

---

[19] March 19, 2020 press briefing at 0:30-0:35, 8:10-8:20, 10:00-10:15, 24:20-24:30, 33:45-33:55, and 35:17-36:00, available as of May 10, 2020 at: https://www.youtube.com/watch?v=8OeyeK8-S5o.
[20] *Id*. at 35:10-35:20.
[21] *Id*. 33:55-34:05.
[22] *Id*. at 5:42-8:09.
[23] Twelfth paragraph of the Proclamation of a State of Emergency, which as of the date of this filing can be found online at: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.
[24] As of May 10, 2020, accessible at: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.18.20-Letter-USNS-Mercy-Hospital-Ship.pdf

19



Complaint                                                                        Case No.

percent of Californians—25.5 million individuals—would be infected by the novel coronavirus. His letter went on to say that "[i]n some parts of our state, our case rate is doubling every four days."[25] On the basis of these projections, he issued his Governor's Order on March 19, 2020.

60.  As of May 7, 2020, there are 58,815 confirmed cases, which is only 0.2% of Governor Newsom's projection.

61.  Newsom expounded on these numbers at his March 19 press conference. He explained that a hospitalization rate of 20 percent could mean that California would face a shortfall of 19,543 hospital beds above the state's current capacity of approximately 78,000 beds.[26] He added that California had a surge capacity of 10,207 additional beds that could partially offset this shortfall.[27] Thus, he was predicting a total shortfall of approximately 9,336 beds.[28]

62.  Mark Ghaly, the governor's Secretary of Health and Human Services, explained that the state came up with the 56 percent estimate by "[u]sing the available literature, advice from the CDC and our understanding and experience in California, we applied a variety of different measures that looked at an attack rate, that looked at the $R_0$ … we looked at … hospitalization rates that we had available as well as other outcome measures."[29]

63.  The Secretary also stated that "[w]e knew that the attack rate of 56 percent that we chose was somewhat in the middle between the high-end and the low-end of what we'd seen in the literature…."[30]

---

[25] *Id.*
[26] March 19, 2020 press briefing, *supra*, at 5:40-7:32.
[27] *Id.* at 7:20-7:40.
[28] *Id.*
[29] *Id.* at 28:49-31:11.
[30] *Id.*



Complaint

Case No.

64.     Newsom admitted that his numbers did not account for any mitigation measures put in place. Rather, those numbers assumed that "we're just along for the ride[.]"[31]

65.     Contrastingly, several infectious disease experts, including Professor of Epidemiology John P.A. Ioannidis of Stanford University, called this an extreme, worst-case scenario that was unlikely to happen.[32] These experts have been proven correct, and the Governor, wrong.

66.     Although the California Emergency Services Act provides the Governor with the power to unilaterally promulgate regulations in an emergency, such regulations must at least be reasonable. Because such regulations may severely impinge the civil liberties of the populace and curb an individual's freedom, only a clear showing of emergent necessity may justify their imposition. Freedom of movement is a fundamental right which may be restricted only where necessary to further the most compelling state interest, and such regulations must be narrowly circumscribed in order to withstand a constitutional challenge for overbreadth and vagueness. *Gayle v. Governor of Guam*, 414 F. Supp. 636, 638-39 (D. Guam 1976) (citing *Carroll v. United States*, 267 U.S. 132 (1925); *People v. McKelvy*, 23 Cal.App.3d 1027 (1972).

67.     It is a widely accepted and understood principle that the judiciary defers to the executive branch during states of emergencies. However, the judiciary must at least review the executive's claims of emergency and not serve as a mere rubber-stamp. Additionally, a deferential "hands-off" approach goes out the window if the legislature has limited the executive's exercise of emergency authority. *See Humanitarian Law*

---

[31] *Id.* at 24:20-24:40.

[32] Newsom: 56 % of Californians Could Get Coronavirus If Nothing Is Done, San Francisco Chronicle, March 19, 2020, available as of May 10, 2020 at: https://webcache.googleusercontent.com/search?q=cache:sokxG9_b-2oJ:https://www.sfchronicle.com/health/article/Newsom-56-of-Californians-could-get-coronavirus-15144438.php+&cd=1&hl=en&ct=clnk&gl=us.

Complaint                                                                                        Case No.

*Project v. U.S. Treasury Dep't,* 578 F.3d 1133, 1145 (9th Cir. 2009) (reviewing Executive Order 13224—President's Bush invocation of authority under the International Emergency Economic Powers Act or IEEPA, declaration of national emergency, sanctioning of terrorist groups, and authorizing of Treasury to designate further terrorist groups for sanctioning—in ruling that it was not unconstitutionally vague); *see also United States v. Nazemzadeh*, No. 11 CR 5726 L, 2014 WL 310460, at 8 (S.D. Cal. Jan. 28, 2014) ("[IEEPA was] a response to two developments: first, extensive use by Presidents of emergency authority under section 5(b) of the Trading with the Enemy Act of 1917 to regulate both domestic and international economic transactions unrelated to a declared state of emergency . . ."). The California Legislature has set the procedures and limitations on the executive's emergency powers at California Government Code section 8550, *et seq*. These laws are not mere surplusage, and the Governor's actions must be measured against limitations placed on his office's powers by the people through their elected representatives.

68.     California state courts also assess an executive's declaration of emergency, its justifications, and orders promulgated under said declaration. *See California Corr. Peace Officers Assn. v. Schwarzenegger*, 163 Cal. App. 4th 802, 818 (2008) (assessing whether Governor's declaration met requirements of Emergency Services Act before ruling that the declaration and the emergency cited—and overcrowded prisons—met the requirements).

69.     Defendant Newsom admitted that the underlying public health goals giving rise to his Governor's Order have been achieved. During a briefing on April 16, 2020, Newsom stated that "[we] have successfully bent and arguably flattened the curve in the



Complaint                                                                                          Case No.

state of California."[33] Therefore, by Governor Newsom's own admission, no rational basis exists any longer to justify the Governor's Order.

70.    The statutory authority by which the Defendants purport to exercise their purportedly untrammeled authority also requires the immediate discontinuation of the Orders once the emergency conditions have abated. California Government Code section 8567 provides "[w]henever the state of war emergency or state of emergency has been terminated, the orders and regulations shall be of no further force or effect." Section 8629 further requires that the Governor "shall proclaim the termination of a state of emergency at *the earliest possible date* that conditions warrant." (Emphasis added.) Continuing the state of emergency despite the abatement of the emergency conditions giving rise to it is *ultra vires,* would constitute an abuse of discretion, and is plainly subject to judicial review. That time has now come.

71.    On information and belief, Plaintiffs allege that conditions giving rise to the Governor's Proclamation on March 4, 2020 no longer meet the requirements of California Government Code section 8558, which requires conditions that "by reason of their magnitude, are or are likely to be beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat."

## INDEFINITE CURTAILMENT OF FUNDAMENTAL RIGHTS

72.    By Defendant Newsom's own admission, the basis for the Governor's Order is now resolved and the Governor's Order should be regarded as null and void, particularly as it pertains to fundamental rights. Defendants must now show compelling state interests requiring them to maintain the Orders and their onerous, invasive requirements.

---

[33] April 16, 2020 briefing by the Governor at 37:20, transcript available as of May 10, 2020, at: https://www.rev.com/blog/transcripts/gov-gavin-newsom-california-covid-19-briefing-transcript-april-16.

23



Complaint                                                                          Case No.

73.    As of May 10, 2020, nearly eight weeks after Newsom's announcement, the number of COVID-19 cases so far in California according to the California Department of Public Health is 66,680.[34]

74.    As of May 10, 2020, according to the California Department of Public Health, the total number of *suspected* COVID-19 cases—including ICU treatment—was 1,301. Adding these together with confirmed COVID-19 hospitalizations (3,248) yields a total of 4,549 patients requiring hospitalization statewide.[35] These numbers were compiled from the reports of 98% of all hospitals in California.[36]

75.    These conditions are infinitesimal in comparison to the 20 percent hospitalization rate and the 56 percent infection rate predicted by Newsom at his March 19, 2020 press conference. Such figures would represent approximately 5 million Californians requiring hospitalization. Without minimizing its significance, 6,096 patients statewide compared to Newsom's projection of 25.5 million infections, over 5 million total hospitalizations, nearly 100,000 simultaneous hospitalizations, and a 9,336-bed shortfall, shows at a minimum that Defendants have relied on grossly flawed and exaggerated predictions since the imposition of the Governor's Order, and have failed to deviate from them despite improved knowledge of the facts. Neither the threatened infection rate nor the hospitalization rate has manifested. Even if the mitigation measures imposed by the Orders prevented these rates from manifesting, Defendants bear the burden of demonstrating that the current draconian measures are narrowly tailored under current circumstances to account for Plaintiffs' fundamental rights.

---

[34] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx (last visited on May 11, 2020).
[35] *Id.*
[36] As of May 10, 2020, available at: https://public.tableau.com/views/COVID-19PublicDashboard/Covid-19Hospitals?%3Aembed=y&%3Adisplay_count=no&%3AshowVizHome=no.

24



Complaint                                                                 Case No.

76.     On information and belief, part of the data that Newsom depended on for his claim of 25.5 million infections in California within eight weeks in his March 18, 2020, letter was the initial rate of infection in Wuhan, the originating epicenter of COVID-19. Then, the numbers apparently showed a frightening infection reproduction rate ("$R_0$") of 5.7.[37]

77.     However, now the $R_0$ of COVID-19 without mitigation efforts is understood to be approximately 2.2-2.7.[38] With mitigation efforts, the $R_0$ of COVID-19 has been driven further down. The current $R_0$ for California is estimated to be 0.83 and has remained at or below 0.84 since approximately April 21, 2020 and has been at 1 or below since approximately April 10, 2020.[39] At rates below 1, the virus is not considered to be spreading.

78.     Effective lowering of the $R_0$ of COVID-19 need not be done with draconian shutdown orders. Social distancing and vigilant sanitation procedures suffice, as seen in Taiwan and other locations which have relied on temperature checkpoints and sanitation to contain the spread of the virus, to great effect.[40]

79.     On April 27, 2020, an independent study released by a team at Stanford University estimated that, based on antibody tests of 3,300 people, as much as 4.16% of Santa Clara County's population (81,000 individuals), had contracted SARS-CoV-2 by

_____

[37] Sanche S, Lin YT, Xu C, Romero-Severson E, Hengartner N, Ke R. High contagiousness and rapid spread of severe acute respiratory syndrome coronavirus 2. As of May 10, 2020, available at: https://doi.org/10.3201/eid2607.200282 and: https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article.
[38] *Id.*
[39] As of May 10, 2020, available at: https://rt.live/.
[40] As of May 10, 2020, accessible at: https://www.cbsnews.com/news/coronavirus-taiwan-great-example-pandemic/ (Taiwan has reported 400 confirmed cases of COVID-19 infections out of a population of 24 million; no shelter in place order was ever issued).



Complaint                                                                                    Case No.

April 3 and 4, 2020.[41] Santa Clara had 39 deaths as of April 4, 2020[42] out of a county population of 1,927,852.[43] This reflects a death rate of those infected with SARS-CoV-2 of not more than 0.048%.

80.     On April 10, 2020, Los Angeles County had 8,430 confirmed cases 241 deaths;[44] on April 11, 2020, Los Angeles County had 8,873 cases and 265 deaths, for an approximate death rate of 2.98 percent.[45] On April 20, 2020, the preliminary results of a collaborative antibody study done between the University of South California and the Public Health Department of Los Angeles County were released. Based on 863 tests, researchers estimated that as many as 5.6 percent of Los Angeles County's population, or 442,000, already had COVID-19 on April 10 and 11.[46] Under this new testing, the death rate decreases from 2.98 percent to 0.599 percent of infections.

81.     A similar antibody test in and by New York City showed that 21 percent of the population (1,763,737) were or had been infected with SARS-CoV-2 With the current number of confirmed deaths (12,571),[47] the putative death rate among those infected is 0.71 percent.

---

[41] As of May 10, 2020, accessible at: https://www.medrxiv.org/content/10.1101/2020.04.14.20062463v2.full.pdf.

[42] As of May 10, 2020, accessible at: https://www.santaclaraca.gov/i-want-to-stay-informed/newsroom/coronavirus-updates/archived-covid-19-news-updates.

[43] https://www.census.gov/quickfacts/fact/table/santaclaracountycalifornia/PST045219

[44] As of May 10, 2020, accessible at: http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail.cfm?unit=media&ou=ph&prog=media&prid=2309.

[45] As of May 10, 2020, accessible at: http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail.cfm?unit=media&ou=ph&prog=media&prid=2311.

[46] As of May 10, 2020, accessible at: http://www.publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2328.

[47] As of May 10, 2020, accessible at: https://www1.nyc.gov/site/doh/covid/covid-19-data.page.

Complaint                                                                                          Case No.

82.   A similar antibody study by Miami-Dade County told a similar story: the confirmed number of deaths (1,268)[48] divided by the estimated number of infections (221,000)[49] gave a putative death rate of 0.57 percent.

83.   Each of the studies described above indicates that the COVID-19 mortality rate falls significantly short of those associated with other epidemics, including the 1917-1918 Spanish Flu, believed to have caused at least 2.5 percent of the infected to die.[50]

84.   Studies and health data show that the Governor's Order would not only be of *no* benefit to preventing the transmission of COVID-19 or death from it—it could actually be detrimental to such efforts.

85.   The Governor's Order should be terminated because: (1) the factual basis of the state of emergency—the overwhelming of hospital resources—has not occurred, and we are past any significant risk of such overwhelming; (2) the State and the people of California are now aware through public information campaigns and the procurement of medical resources for COVID-19; (3) residents have been educated and are implementing infection rate mitigation efforts through social distancing, hygiene, and other means; (4) the models the Governor's Order was based on have proven completely invalid; and (5) the infection rate has been reduced to a manageable level, which many other governments have used to justify lifting COVID-19 restrictions far less onerous than the ones imposed by Defendants.

---

[48] As of May 10, 2020, accessible at: https://www.miamiherald.com/news/coronavirus/article242395581.html.
[49] As of May 10, 2020, accessible at: https://www.miamidade.gov/releases/2020-04-24-sample-testing-results.asp.
[50] As of May 10, 2020, accessible at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3291398/.

Complaint                                                                                           Case No.

86.     As of May 10, 2020, there was a total of 78,771 deaths[51] in the United States out of a total population of 328,239,523. Based on these numbers, the United States' actual death rate due to COVID-19 is approximately 0.02 percent (or 1 for every 4,167). Nearly 40% of those deaths have occurred in nursing homes. In California, the percentage of deaths occurring in nursing homes is about 38.4% as of information reported through May 7, 2020,[52] a ratio that is expected to rise.

87.     As of May 10, 2020, there was a total of 2,745 deaths[53] in California out of a total population of 39,512,223. Based on these numbers, the California's actual death rate due to COVID-19 is approximately 0.0069 percent (or 1 for every 14,394).

## CALIFORNIA FEDERAL COURTS ARE TREATING FEDERAL AND STATE EXECUTIVE ORDERS DIFFERENTLY

88.     A troubling dichotomy has emerged in California federal courts during the COVID-19 pandemic. Some courts have given broad deference to the state executive branch, even when actions such as the Governor's Order infringe upon fundamental rights and also exceed statutory authority.[54]

89.     At the same time, other courts have closely scrutinized the constitutionality of the exercise of federal executive power, striking down many executive actions taken by, most recently, President Trump.

90.     In *United States v. California*, 921 F.3d 865 (9th Cir. 2019), the Court allowed states to order state law enforcement to be uncooperative with federal immigration authorities.

---

[51] As of May 10, 2020, accessible at: https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html
[52] As of May 9, 2020, accessible at: https://freopp.org/the-covid-19-nursing-home-crisis-by-the-numbers-3a47433c3f70
[53] As of May 10, 2020, accessible at: https://covid19.ca.gov/
[54] *Gish v. Newsom*, 5:20-cv-00755, Doc. #51 (D.C. C.D 4/23/20); *Cross Culture Christian Center v. Newsom*, 2:20-cv-00832, Doc. #23 (D.C. E.D. 5/5/20).

28



Complaint                                                                    Case No.

91.     In *California v. Trump*, 407 F.Supp.3d 869, 892 (N.D. Cal. 2019), the court gave a close reading to 10 U.S.C. § 2801(a)'s use of the term "military installation" to bar President Trump's use of military funds for a border wall, despite acknowledging that he was in the right in his declaration of a state of emergency.

92.     In *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1087-88 (9th Cir. 2020), the Court went so far as to cite U.S. obligations to asylum seekers under a U.N. refugee treaty as a basis for rejecting President Trump's rule that asylum seekers "must enter through official port of entry."

93.     California's federal courts have treated claims challenging executive actions, including under emergency authority, very differently depending upon which executive is claiming broad deference. This dichotomy poorly serves the administration of justice.

## CLAIMS FOR RELIEF

## FIRST CLAIM:

## VIOLATION OF THE DUE PROCESS CLAUSE OF
## THE FOURTEENTH AMENDMENT

(*By All Plaintiffs Against All Defendants*)

94.     Plaintiffs incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully set forth herein.

95.     The Due Process Clause contains both a substantive and a procedural component. *United States v. Salerno*, 481 U.S. 739, 746 (1987). Substantive due process "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993); *see also Daniels v. Williams*, 474 U.S. 327, 331 (1986) (explaining that substantive due process will "bar certain government actions regardless of the fairness of the procedures used to implement them."). Procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests

Complaint                                                                                    Case No.

within the meaning of the Due Process Clause." *Mathews v. Eldridge*, 424 U.S. 319, 322 (1976). Procedural due process does not forbid the government from depriving individuals of a protected interest, but rather requires the government to employ adequate procedures that ensure the fairness of any deprivation. *See McNabb v. United States*, 318 U.S. 332, 347 (1943).

96.     The Orders and Defendants' enforcement thereof violate Plaintiffs' substantive due process rights as follows:

> a.     Plaintiffs' fundamental property interest in conducting lawful business activities is protected by the Due Process Clause of the Fourteenth Amendment. *Medina v. Rudman,* 545 F.2d 244, 250 (1st Cir. 1976) (included among the substantive rights so protected is the right to pursue one's vocation under a state-granted license) (citing *Paul v. Davis*, 424 U.S. 693 (1976)).

> b.     Plaintiffs have been issued cosmetology licenses by the State of California, and therefore have a right to lawfully pursue that vocation, a substantive due process right impaired by Defendants' actions.

> c.     Defendants lack any legitimate or compelling interest for depriving Plaintiffs of their right to lawfully pursue their vocations.

> d.     Even if such a legitimate, compelling interest existed, Defendants' Orders are not rationally related or narrowly tailored to further any such interest.

97.     The Orders and Defendants' enforcement thereof violate Plaintiffs' procedural due process rights as follows:

> a.     The Governor's Order and Dr. Angell's List of "Essential" Workers and Businesses are arbitrary to the point of contradicting themselves, and thus are invalidated by the Fourteenth Amendment's procedural due process protections.



Complaint                                                                                    Case No.

   b.  Procedural due process, at a minimum, would require Plaintiffs having a meaningful opportunity to respond to the Order (or the continuation thereof) and explain how and why it is constitutionally invalid as applied to Plaintiffs. However, the Governor's Order and Dr. Angell's List have prevented Plaintiffs from challenging the application of the Order and the List to them, denying them any process whatsoever before their rights were forcibly taken.

   c.  Further, this taking lasts indefinitely, with neither the Order nor the List providing for any mechanism or opportunity to review or challenge the need to continue the Order in the light of developing events.

98. Defendants' actions therefore have deprived Plaintiffs of both procedural and substantive Due Process.

99. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders against Plaintiffs.

100. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating or restraining enforcement of the Orders.

101. Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**SECOND CLAIM**

**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF**

**THE FOURTEENTH AMENDMENT**

(*By All Plaintiffs Against All Defendants*)

102. Plaintiffs incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully set forth herein.

Complaint                            Case No.

103.   At its core, the Equal Protection Clause of the 14th Amendment to the U.S. Constitution requires states to govern impartially—not draw arbitrary distinctions between businesses based solely on differences that are irrelevant to a legitimate governmental objective.

104.   Strict scrutiny under the Equal Protection Clause applies where the classification impinges on fundamental rights (*San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973)), including the right to due process and the right to travel (both interstate and intrastate), among others. Defendants have violated Plaintiffs' procedural and substantial due process rights under the Fourteenth Amendment.

105.   Defendants cannot satisfy strict scrutiny, because their arbitrary classifications are not narrowly tailored measures that further compelling government interests.

106.   Defendants have intentionally and arbitrarily categorized California businesses and conduct as either "essential" or "non-essential." Those businesses classified as "essential," or as participating at least partly in "essential services," are permitted to go about their business and activities, even when the businesses also provide "non-essential" goods and services. Those classified as "non-essential," are required to completely shut down. Entertainment providers are deemed essential, whereas Plaintiffs, who provide basic personal grooming services (which would be legal if provided to entertainment industry consumers as opposed to the average Californian), are not. Many businesses which sell personal hygiene supplies and hair dye are deemed essential, but Plaintiffs, who sell such supplies as part of their grooming services, are not. Defendants have therefore arbitrarily discriminated against Plaintiffs in violation of Plaintiffs' equal protection rights.

107.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

32



Complaint                                                                                      Case No.

108.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

109.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**THIRD CLAIM**

**VIOLATION OF THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT BY INTERFERENCE WITH LICENSES AND PROPERTY**

(*By All Plaintiffs Against All Defendants*)

110.   Plaintiffs incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully set forth herein.

111.   Plaintiffs complied and continue to comply with the State's requirements to obtain the appropriate licenses and/or permits to conduct their businesses and at all times relevant to this Complaint, Plaintiffs had the right to continue to operate under their licenses, and their related commercial activities were continuous and lawful pursuant to California law, and particularly the regulations promulgated by the Department of Consumer Affairs – Board of Barbering and Cosmetology.

112.   The California Supreme Court has held the right to engage in a licensed profession is a property right of such high character that revocation of that license should only occur upon clear proof that the licensee has forfeited the same, and only in strict conformity to the statute authorizing its forfeiture. *Cavassa v. Off*, 206 Cal. 307 (1929). The licenses are therefore personal property to which the takings clause applies.

113.   The regulatory actions taken by the Defendants have resulted in Plaintiffs being deprived of all economically beneficial or productive use of their property including, without limitation, their licenses, their leased property, and their business property, and further resulted in the involuntary closing of their businesses, ultimately making them worse than worthless, in that they have to pay license fees, rent, property

33



Complaint                                                                                      Case No.

maintenance, and related expenses for property they are barred by law from using. The California Supreme Court has found that "While the police power is very broad in concept, it is ***not without restrictions*** in relation to the taking of damaging of property. When it passes ***beyond proper bounds in its invasion of property rights***, it in effect comes within the purview of the law of eminent domain and its exercise requires compensation." *House v. Los Angeles County Flood Control Dist.*, 25 Cal.2d 384 (1944). (Emphasis added).

114.   Defendants' Orders and the enforcement thereof has caused both a complete and total regulatory and physical taking of Plaintiffs' property without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution. At a minimum, the effect of Defendants' Orders constitutes a "partial" taking under the *Penn-Central* three-factor test. See *Penn Central Trans. Co. v. City of New York*, 438 U.S. 104, 124 (1978). As a result, Defendants' blatant violation of the Takings Clause of the 5th Amendment has caused proximate and legal harm to Plaintiffs.

115.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

116.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

117.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.



Complaint                                                                                          Case No.

# FOURTH CLAIM
## VIOLATION OF THE CALIFORNIA CONSTITUTION
## RIGHT TO LIBERTY (CAL. CONST. ART. 1, § 1)
### (*By All Plaintiffs Against All Defendants*)

118.   Plaintiffs incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

119.   Since 1879, the California Constitution has provided intrinsic and unalienable rights and liberties to its citizens. Chief among those rights and liberties are those found in Article 1 of the California Constitution. Article 1, Sections 1 of the California Constitution provides, in pertinent part:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

120.   Defendants' Orders have not only interfered with Plaintiffs' rights and liberties as set forth under Article 1, Sections 1, 7, and 19 of the California Constitution, but have deprived them of the use, enjoyment and ability to operate their respective businesses because of a discriminatory classification as "non-essential" businesses.

121.   Defendants' Orders have proximately and legally caused tremendous financial harm not just to Plaintiffs businesses, but to the entire California economy, which will continue to have deleterious effects unless and until Defendants are enjoined by this Court from enforcing their respective Orders.

122.   Requiring Plaintiffs to abstain from conducting lawful business in the State of California merely because their businesses have been arbitrarily deemed "non-essential," despite other compliance measures being taken to satisfy the public's important health interests, violates their California Constitutional liberty rights. The burden is on State actors to prove these actions meet strict scrutiny, particularly when



Complaint                                                                                    Case No.

evidence shows that the risk of shortfalls in hospital equipment, supplies, and personnel have faded into irrelevance in conjunction with a drastic decline in morbidity and mortality occurrence and projections.

123.    Left with no adequate remedy at law, Plaintiffs will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

124.    Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorney fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

## FIFTH CLAIM

## VIOLATION OF THE CALIFORNIA CONSTITUTION
## RIGHT TO PROPERTY (CAL. CONST. ART. 1, § 7)

### (*By All Plaintiffs Against All Defendants*)

125.    Plaintiffs incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

126.    Article 1, Section 7 of the California Constitution provides, in pertinent part:

(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws; provided, that nothing contained herein or elsewhere in this Constitution imposes upon the State of California or any public entity, board, or official any obligations or responsibilities which exceed those imposed by the Equal Protection Clause of the 14th Amendment to the United States Constitution with respect to the use of pupil school assignment or pupil transportation. In enforcing this subdivision or any other provision of this Constitution, no court of this State may impose upon the State of California or any public entity, board, or official any obligation or responsibility with respect to the use of pupil school assignment or pupil transportation, (1) except to remedy a specific violation by such party that would also constitute a violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution, and (2) unless a federal court would be permitted under federal decisional law to impose that obligation or responsibility upon such party to remedy

Complaint                                                                    Case No.

the specific violation of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

127.   Requiring Plaintiffs to abstain from conducting lawful business in the State of California, despite the availability of compliance measures available and being taken by so-called "essential businesses" to satisfy the public health interests at stake, violates their California Constitutional liberty rights.

128.   Plaintiffs have no adequate remedy at law, and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

129.   Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorney fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

## SIXTH CLAIM
## VIOLATION OF THE CALIFORNIA CONSTITUTION
## TAKINGS WITHOUT COMPENSATION (CAL. CONST. ART. 1, § 19)
### (*By All Plaintiffs Against All Defendants*)

130.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

131.   Article 1, Section 19 of the California Constitution provides, in pertinent part: Article 1, Section 19:

(a) Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation.

132.   California courts have routinely held that the California Constitution provides just compensation to property owners when their land is taken for public use, because the law seeks to bar the government from forcing some people alone to bear



Complaint                                                                                    Case No.

public burdens which, in all fairness and justice, should be borne by the public as a whole. *Jefferson Street Ventures, LLC v. City of Indio*, 236 Cal. App. 4th 1175 (2015).

133.  The principle underlying just compensation for property taken for public use is to put the owner in as good a position monetarily as he or she would have occupied if his or her property had not been taken. *City of Carlsbad v. Rudvalis*, 109 Cal. App. 4th 667 (2003).

134.  Finally, the constitutional guarantee of just compensation for property taken by the government is not only intended to protect the landowner (or business owner), but it also protects the public by limiting its liability to losses that can fairly be attributed to the taking. *Emeryville Redevelopment v. Harcros Pigments, Inc.*, 101 Cal. App. 4th 1083 (2002).

135.  Requiring Plaintiffs to abstain from conducting lawful business in the State of California, despite the availability of other compliance measures being taken to satisfy the public health interests at stake, violates their California Constitutional liberty rights.

136.  Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

137.  Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorney fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

138.  For an order and judgment providing injunctive and declaratory relief;

139.  An order temporarily, preliminarily, and permanently enjoining and prohibiting Defendants from enforcing the Orders against Plaintiffs as to practicing their professions;

140.  For attorneys' fees and costs.



Complaint                                                                                     Case No.

1    141.   Grant all other such relief as the Court may deem just and proper.

2

3   Date: May 12, 2020                    DHILLON LAW GROUP INC.

4                                   By:   /s Harmeet Dhillon
5                                         HARMEET K. DHILLON
                                          MARK P. MEUSER
6                                         GREGORY R. MICHAEL

7
                                          VOLLEBREGT LAW CORPORATION
8                                         JAKE M. VOLLEBREGT

9
                                          Attorneys for Plaintiffs
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Complaint                                                               Case No.

EXHIBIT 1

# EXECUTIVE DEPARTMENT
## STATE OF CALIFORNIA

### EXECUTIVE ORDER N-33-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

    ORDER OF THE STATE PUBLIC HEALTH OFFICER
    March 19, 2020

    To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

    Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

    The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or

destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

_____

GAVIN NEWSOM
Governor of California

**ATTEST:**

_____

ALEX PADILLA
Secretary of State



# EXHIBIT 2

April 28, 2020

# ESSENTIAL WORKFORCE

On March 19, 2020, Governor Newsom issued Executive Order N-33-20 directing all residents immediately to heed current State public health directives to stay home, except as needed to maintain continuity of operations of essential critical infrastructure sectors and additional sectors as the State Public Health Officer may designate as critical to protect health and well-being of all Californians.

In accordance with this order, the State Public Health Officer has designated the following list of "Essential Critical Infrastructure Workers" to help state, local, tribal, and industry partners as they work to protect communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security.

**Sector Index:**

1. Health and Public Health Sector
2. Emergency Services Sector
3. Food and Agriculture Sector
4. Energy Sector
5. Water and Wastewater Sector
6. Transportation and Logistics Sector
7. Communications and Information Technology Sector
8. Government Operations and Other Community-Based Essential Functions
9. Critical Manufacturing Sector
10. Financial Services Sector
11. Chemical Sector
12. Defense Industrial Base Sector
13. Industrial, Commercial, Residential and Sheltering Facilities and Services

**Relevant Guidance For All Sectors:**

- Face Coverings Guidance
  - Orientación Sobre el Uso de Mascarillas de Tela
- Self-Isolation for Older Adults and Those Who Have Elevated Risk
  - Aislamiento para Adultos Mayores y Personas que Tienen un Riesgo Elevado
- Employers, health care workers and workers in general industry

April 28, 2020

# 1. HEALTHCARE / PUBLIC HEALTH

**Sector Profile**

The Healthcare and Public Health (HPH) Sector is large, diverse, and open, spanning both the public and private sectors. It includes publicly accessible healthcare facilities, research centers, suppliers, manufacturers, and other physical assets and vast, complex public-private information technology systems required for care delivery and to support the rapid, secure transmission and storage of large amounts of HPH data.

**Essential Workforce, if remote working is not practical:**

1. Health care providers and caregivers (including physicians, dentists, psychologists, mid-level practitioners, nurses, assistants, and aids; infection control and quality assurance personnel; pharmacists; physical, respiratory, speech and occupational therapists and assistants; social workers and providers serving individuals with disabilities including developmental disabilities; optometrists; speech pathologists; chiropractors; diagnostic and therapeutic technicians; and radiology technologists).
2. Workers required for effective clinical, command, infrastructure, support service, administrative, security and intelligence operations across the direct patient care and full healthcare and public health spectrum, including accounting, administrative, admitting and discharge, engineering, accrediting, certification, licensing, credentialing, epidemiological, source plasma and blood donation, food service, environmental services, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians; emergency medical services workers; prehospital workers including but not limited to urgent care workers; inpatient and hospital workers; outpatient care workers; home care workers; workers at long-term care facilities, residential and community-based providers; workplace safety workers).
3. Workers needed to support transportation to and from healthcare facilities and provider appointments.
4. Workers needed to provide laundry services, food services, reprocessing of medical equipment, and waste management.
5. Vendors and suppliers (including imaging, pharmacy, oxygen services, durable medical equipment)
6. Workers who perform critical clinical research, development, and testing needed for COVID-19 response.
7. Workers in other medical and life science facilities (including Ambulatory Health and Surgical, Blood Banks, Clinics, Community Mental Health, Comprehensive Outpatient rehabilitation, End Stage Renal Disease, Health Departments, Home Health care, Hospices, Hospitals, Long Term Care, Organ Pharmacies, Procurement Organizations, Psychiatric, Residential, Rural Health Clinics and Federally Qualified Health Centers, and retail facilities specializing in medical goods and supplies, including cannabis).
8. Workers for health manufacturing (including life science companies, and companies that have shifted production to medical supplies), materials and parts suppliers, technicians, logistics and warehouse operators, printers, packagers, and distributors of medical equipment (including those who test and repair), personal protective equipment (PPE), isolation barriers, medical

2

April 28, 2020

gases, pharmaceuticals (including materials used in radioactive drugs, and cannabis products), dietary supplements, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, personal hygiene products, and tissue and paper towel products.

9. Public health / community health workers, including those who compile, model, analyze and communicate public health information.

10. Behavioral and mental health workers responsible for coordination, outreach, engagement, and treatment to individuals in need of mental health and/or behavioral services.

11. Donors of blood bone marrow, blood stem cell, or plasma and the workers of the organizations that operate and manage related activities.

12. Workers that manage health plans, billing, and health information.

13. Workers who conduct community-based public health functions, conducting epidemiologic surveillance, compiling, analyzing and communicating public health information.

14. Workers performing IT and cybersecurity functions at healthcare and public health facilities.

15. Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions.

16. Pharmacy employees, including workers necessary to maintain uninterrupted prescription filling.

17. Workers in retail facilities specializing in medical goods and supplies.

18. Public health and environmental health workers, including workers specializing in environmental health that focus on implementing environmental controls, sanitary and infection control interventions, healthcare facility safety and emergency preparedness planning, engineered work practices, and developing guidance and protocols for appropriate PPE to prevent COVID-19 disease transmission; Public health/ community health workers (including call center workers) who conduct community- based public health functions, conducting epidemiologic surveillance and compiling, analyzing, and communicating public health information.

19. Mortuary services providers, including workers performing mortuary, funeral, cremation burial, cemetery, and related services, including funeral homes, crematoriums, cemetery workers and coffin makers.

20. Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to behavioral and mental health services to the family members, responders, and survivors of an incident.

21. Workers supporting veterinary hospitals and clinics.


**Relevant Sector Guidance:**

- All Facility Letters for health care facilities, including long-term care facilities
- Health care facilities, Skilled Nursing Facilities
- Individuals with Access and Functional Needs
- Medical Waste Management - Interim Guidelines
- Outpatient Healthcare Facility Infection Control Recommendations for Suspect COVID-19 Patients
- Prioritization of Patients for Laboratory Testing for COVID-19
- Veterinary Professionals and Premises
- Regional Centers:
  - Visits to Licensed Residential Facilities
  - Risk Mitigation Strategies for ARFPSHN, ICF/DD-CN
- Adult and Senior Care Facilities

3

April 28, 2020

- Cuidado a los Adultos Mayores
- Community care facilities, including assisted living facilities and child care
- Medi-Cal Managed Care Health Plans: COVID – 19 Screening and Testing
- Coverage Options Fact Sheet
  - Opciones De Cobertura
- Department of Managed Health Care All Plan Letter
- California Department of Insurance Bulletin

April 28, 2020

## 2. EMERGENCY SERVICES SECTOR

**Sector Profile**

The Emergency Services Sector (ESS) is a community of highly-skilled, trained personnel, along with the physical and cyber resources, that provide a wide range of prevention, preparedness, response, and recovery services during both day-to-day operations and incident response. The ESS includes geographically distributed facilities and equipment in both paid and volunteer capacities organized primarily at the federal, state, local, tribal, and territorial levels of government, such as city police departments and fire stations, county sheriff's offices, Department of Defense police and fire departments, and town public works departments. The ESS also includes private sector resources, such as industrial fire departments, private security organizations, and private emergency medical services providers.

**Essential Workforce, if remote working is not practical:**

1. Public, private, and voluntary personnel (front line and management) in emergency management, law enforcement, fire and rescue services, emergency medical services, corrections, rehabilitation and reentry, search and rescue, hazardous material response, and technicians supporting maritime and aviation emergency response.
2. Public Safety Answering Points and 911 call center employees; personnel involved in access to emergency services including the emergency alert system and wireless emergency alerts.
3. Fusion Center employees
4. Workers who support weather disaster / natural hazard monitoring, response, mitigation, and prevention, including personnel conducting, supporting, or facilitating wildfire mitigation activities
5. Workers – including contracted vendors -- who maintain, manufacture, or supply equipment and services supporting law enforcement, fire, EMS, and and emergency service response operations (including safety equipment, electronic security, and uniforms)
6. Workers responding to abuse and neglect of children, elders and dependent adults.
7. Animal control officers and humane officers
8. Security staff to maintain building access control and physical security measures
9. Workers and contracted vendors who maintain and provide services and supplies to public safety facilities, including emergency communication center, public safety answering points, public safety communications centers, emergency operation centers, fire and emergency medical services stations, police and law enforcement stations and facilities.

**Relevant Sector Guidance:**

- Public Health Guidance about COVID-19 for California State Prisons
- First responders, including paramedics and EMTs

# 3. FOOD AND AGRICULTURE

**Sector Profile**

The Food and Agricultural (FA) Sector is composed of complex production, processing, and delivery systems and has the capacity to feed people and animals both within and beyond the boundaries of the United States. Beyond domestic food production, the FA Sector also imports many ingredients and finished products, leading to a complex web of growers, processors, suppliers, transporters, distributors, and consumers. This sector is critical to maintaining and securing our food supply.

**Essential Workforce, if remote working is not practical:**

1. Workers supporting groceries, pharmacies, convenience stores, and other retail that sells food or beverage products, and animal/pet food, retail customer support service, information technology support staff, for online orders, pickup/takeout or delivery.
2. Workers supporting restaurant carry-out and quick serve food operations, including food preparation, carry-out and delivery food employees.
3. Food manufacturer employees and their supplier employees to include those employed in food ingredient production and processing facilities; aquaculture and seafood harvesting facilities; livestock, poultry, seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; and the production of food packaging, including recycling operations and processing.
4. Farmers, farm and ranch workers, and agribusiness support services to include those employed in auction and sales; grain and oilseed handling, storage, processing and distribution; animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; truck delivery and transport.
5. Farmers, farm and ranch workers, support service workers and their supplier employees producing food supply domestically and for export to include those engaged in raising, cultivating, harvesting, packing, storing, or delivering to storage or to market or to a carrier for transportation to market any agricultural or horticultural commodity for human consumption; those engaged in producing and harvesting field crops; cannabis growers; agricultural and commodity inspection; fuel ethanol facilities; storage facilities; biodiesel and renewable diesel facilities; and other agricultural inputs
6. Employees and firms supporting food, feed, and beverage distribution and ingredients used in these products including warehouse workers, vendor-managed inventory controllers, and blockchain managers.
7. Workers supporting the sanitation of all food manufacturing processes and operations from wholesale to retail.
8. Workers supporting the growth and distribution of plants and associated products for home gardens.
9. Workers in cafeterias used to feed workers, particularly worker populations sheltered against COVID-19
10. Workers in animal diagnostic and food testing laboratories
11. Workers essential for assistance programs and government payments
12. Government, private, and non-governmental organizations' workers essential for food assistance programs (including school lunch programs) and government payments.

6

April 28, 2020

13. Employees of companies engaged in the production, storage, transport, and distribution of chemicals; medicines, including cannabis; vaccines; and other substances used by the food and agriculture industry, including seeds, pesticides, herbicides, fertilizers, minerals, enrichments, and other agricultural production aids.
14. Animal agriculture workers to include those employed in veterinary health (including those involved in supporting emergency veterinary or livestock services); raising of animals for food; animal production operations; livestock markets; slaughter and packing plants, manufacturers, renderers, and associated regulatory and government workforce.
15. Transportation supporting animal agricultural industries, including movement of animal medical and reproductive supplies and material, animal vaccines, animal drugs, feed ingredients, feed, and bedding, live animals, animal medical materials; transportation of deceased animals for disposal; and associated regulatory and government workforce
16. Workers who support sawmills and the manufacture and distribution of fiber and forest products, including, but not limited to timber, paper, and other wood and fiber products
17. Employees engaged in the manufacture and maintenance of equipment and other infrastructure necessary to agricultural production and distribution
18. Workers at animal care facilities that provide food, shelter, veterinary and/or routine care and other necessities of life for animals.

**Relevant Sector Guidance:**

- Food, Beverage, Other Services
  - Alimentos, Bebidas y Otros Sitios de Servicios Relacionados
- Food Industry and Food Supply Chain

7

April 28, 2020

# 4. ENERGY

**Sector Profile**

The Energy Sector consists of widely diverse and geographically dispersed critical assets and systems that are often interdependent of one another. This critical infrastructure is divided into three interrelated segments or subsectors—electricity, oil, and natural gas—to include the production, refining, storage, and distribution of oil, gas, and electric power. The Energy Sector supplies fuels to the transportation industry, electricity to households and businesses, and other sources of energy that are integral to growth and production across the Nation. In turn, it depends on the Nation's transportation, information technology, communications, finance, water, and government infrastructures.

**Essential Workforce, if remote working is not possible:**

1. Workers supporting the energy sector, regardless of the energy source, segment of the system, or infrastructure the worker is involved in, or who are needed to monitor, operate, engineer, and maintain the reliability, safety, environmental health, physical and cyber security of the energy system, including power generation, transmission and distribution.
2. Workers supporting the energy sector, regardless of the energy source, needed for construction, manufacturing, transportation and logistics, maintenance, and permitting.
3. IT and OT technology for essential energy sector operations including support workers, customer service operations, call centers, and emergency response and customer emergency operations; energy management systems, control systems, Supervisory Control and Data Acquisition SCADA systems, and energy sector entity data centers; cybersecurity engineers; and cybersecurity risk management.
4. Workers providing services related to energy sector fuels and supply chains, supporting the procurement, mining, drilling, processing, refining, manufacturing, refueling, construction, logistics, transportation (including marine transport, terminals, rail and vehicle transport), permitting operation and maintenance, security, waste disposal, storage, and monitoring of support for resources;
5. Workers supporting environmental remediation and monitoring.
6. Workers supporting manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service at energy sector facilities across all energy sectors, and regardless of the energy source.
7. Workers at Independent System Operators and Regional Transmission Organizations, and Network Operations staff, engineers and technicians to manage the network or operate facilities.
8. Workers at Reliability Coordinator, Balancing Authorities, and primary and backup Control Centers, including but not limited to independent system operators, regional transmission organizations, and balancing authorities; and workers involved in energy commodity trading and scheduling.
9. Mutual assistance personnel, which may include workers from outside of the state or local jurisdiction
10. Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them.

8

April 28, 2020

# 5. WATER AND WASTEWATER

**Sector Profile**

The Water and Wastewater Sector is a complex sector composed of drinking water and wastewater infrastructure of varying sizes and ownership types. Multiple governing authorities pertaining to the Water and Wastewater Sector provide for public health, environmental protection, and security measures, among others.

**Essential Workforce, if remote working is not practical:**

Employees needed to operate and maintain drinking water and wastewater/drainage infrastructure, including:

1. Operational staff at water authorities
2. Operational staff at community water systems
3. Operational staff at wastewater treatment facilities
4. Workers repairing water and wastewater conveyances and performing required sampling or monitoring
5. Operational staff for water distribution and testing
6. Operational staff at wastewater collection facilities
7. Operational staff and technical support for SCADA Control systems
8. Chemical disinfectant suppliers for water and wastewater and personnel protection
9. Workers that maintain digital systems infrastructure supporting water and wastewater operations

April 28, 2020

# 6. TRANSPORTATION AND LOGISTICS

**Sector Profile**

The Transportation Systems Sector consists of seven key subsectors, or modes:

- Aviation includes aircraft, air traffic control systems, and airports, heliports, and landing strips. Commercial aviation services at civil and joint-use military airports, heliports, and sea plane bases.  In addition, the aviation mode includes commercial and recreational aircraft (manned and unmanned) and a wide variety of support services, such as aircraft repair stations, fueling facilities, navigation aids, and flight schools.

- Highway and Motor Carrier encompasses roadway, bridges, and tunnels. Vehicles include trucks, including those carrying hazardous materials; other commercial vehicles, including bicycles, commercial motor coaches and school buses; vehicle and driver licensing systems; taxis, transportation services including Transportation Network Companies, and delivery services including Delivery Network Companies; traffic management systems; AND cyber systems used for operational management.

- Maritime Transportation System consists of coastline, ports, waterways, and intermodal landside connections that allow the various modes of transportation to move people and goods to, from, and on the water.

- Mass Transit and Passenger Rail includes terminals, operational systems, and supporting infrastructure for passenger services by transit buses, trolleybuses, monorail, heavy rail—also known as subways or metros—light rail, passenger rail, and vanpool/rideshare.

- Pipeline Systems consist of pipelines carrying natural gas hazardous liquids, as well as various chemicals. Above-ground assets, such as compressor stations and pumping stations, are also included.

- Freight Rail consists of major carriers, smaller railroads, active railroad, freight cars, and locomotives.

- Postal and Shipping includes large integrated carriers, regional and local courier services, mail services, mail management firms, and chartered and delivery services.

**Essential Workforce, if remote working is not practical:**

1. Employees supporting or enabling transportation functions, including truck drivers, bus drivers, dispatchers, maintenance and repair technicians, warehouse workers, truck stop and rest area workers, towing and recovery services, roadside assistance workers, intermodal transportation personnel, and workers that maintain and inspect infrastructure
2. Working supporting or providing services that enable logistics operations for essential sectors, wholesale and retail sale, including warehousing, cooling, storing, packaging, and distributing products for wholesale or retail sale or use.
3. Workers supporting maintenance and operation of essential highway infrastructure, including roads, bridges, and tunnels.

10

April 28, 2020

4.  Workers of firms providing services, supplies, and equipment that enable warehouse and operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use.

5.  Mass transit workers providing critical transit services and/or performing critical or routine maintenance to mass transit infrastructure or equipment.

6.  Employees supporting personal and commercial transportation services, including taxis, bicycle services, Transportation Network Companies, and delivery services including Delivery Network Companies

7.  Workers responsible for operating dispatching passenger, commuter and freight trains and maintaining rail infrastructure and equipment

8.  Maritime transportation and inland waterway workers – to include maintenance and repair – including port authority and commercial facility personnel, dredgers, port workers, mariners, ship crewmembers, ship pilots and tugboat operators, ship supply, chandler, and equipment operators.

9.  Workers who support the operation, inspection, and maintenance of essential dams, locks, and levees.

10. Workers who support the inspection and maintenance of aids to navigation and other government-provided services that ensure continued maritime commerce.

11. Workers supporting transportation of chemicals, hazardous, medical, waste and recyclable materials to support critical sectors and infrastructure.

12. Automotive repair, maintenance, and transportation equipment manufacturing and distribution facilities.

13. Transportation safety inspectors, including hazardous material inspectors and accident investigator inspectors

14. Manufacturers and distributors (to include service centers and related operations) of lighting and communication systems, specialized signage and structural systems, emergency response equipment and support materials, printers, printed materials, packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations

15. Postal, parcel, courier, last-mile delivery, and shipping workers, to include private companies who accept, process, transport, and deliver information and goods.

16. Workers who supply equipment and materials for maintenance of transportation equipment.

17. Employees who repair and maintain vehicles, aircraft, rail equipment, marine vessels, bicycles, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers

18. Workers who support air transportation for cargo and passengers, including operation distribution, maintenance, and sanitation. This includes air traffic controllers, flight dispatchers, maintenance personnel, ramp workers, fueling agents, flight crews, airport safety inspectors and engineers, airport operations personnel, aviation and aerospace safety workers, security, commercial space personnel, operations personnel, accident investigators, flight instructors, and other on- and off-airport facilities workers.

19. Workers critical to the manufacturing, distribution, sales, rental, leasing, repair, and maintenance of vehicles and other transportation equipment (including electric vehicle charging stations) and the supply chains that enable these operations, subject to adhering public health guidance issued by CDPH.

20. Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, construction material

11

April 28, 2020

suppliers,  traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues

21. Workers who support, such as road and line clearing, to ensure the availability of needed facilities, transportation, energy and communications.

April 28, 2020

# 7. COMMUNICATIONS AND INFORMATION TECHNOLOGY

**Sector Profile**

The Communications Sector provides products and services that support the efficient operation of today's global information-based society. Communication networks enable people around the world to contact one another, access information instantly, and communicate from remote areas. This involves creating a link between a sender (including voice signals) and one or more recipients using technology (e.g., a telephone system or the Internet) to transmit information from one location to another. Technologies are changing at a rapid pace, increasing the number of products, services, service providers, and communication options. The national communications architecture is a complex collection of networks that are owned and operated by individual service providers. Many of this sector's products and services are foundational or necessary for the operations and services provided by other critical infrastructure sectors. The nature of communication networks involves both physical infrastructure (buildings, switches, towers, antennas, etc.) and cyber infrastructure (routing and switching software, operational support systems, user applications, etc.), representing a holistic challenge to address the entire physical-cyber infrastructure.

The IT Sector provides products and services that support the efficient operation of today's global information-based society and are integral to the operations and services provided by other critical infrastructure Sectors. The IT Sector is comprised of small and medium businesses, as well as large multinational companies. Unlike many critical infrastructure Sectors composed of finite and easily identifiable physical assets, the IT Sector is a functions-based Sector that comprises not only physical assets but also virtual systems and networks that enable key capabilities and services in both the public and private sectors.

**Essential Workforce – Communications, if remote working is not practical:**

1. Maintenance of communications infrastructure- including privately owned and maintained communication systems- supported by technicians, operators, call-centers, wireline and wireless providers, cable service providers, satellite operations, Internet Exchange Points, Network Access Points, back haul and front haul facilities, and manufacturers and distributors of communications equipment.
2. Workers performing functions related to undersea cable infrastructure and support facilities, including cable landing sites, beach manhole vaults and covers, submarine cable depots, and submarine cable ship facilities
3. Government and private sector employees supporting Department of Dense internet and communications facilities.
4. Workers who support radio, television, and media service, including, but not limited to front line news reporters, studio, and technicians for newsgathering, reporting, and publishing news.
5. Network Operations staff, engineers and/or technicians to include IT managers and staff, HVAC & electrical engineers, security personnel, software and hardware engineers, and database administrators that manage the network or operate facilities
6. Workers responsible for infrastructure construction and restoration, including contractors for construction and engineering of fiber optic cables, buried conduit, small cells, other wireless facilities, and other communications sector-related infrastructure. This includes construction of

13

new facilities and deployment of new technology required to address congestion or customer usage on remote services.

7. Installation, maintenance and repair technicians that establish, support or repair service as needed.

8. Central office personnel to maintain and operate central office, data centers, and other network office facilities, and critical support personnel assisting front line employees

9. Customer service and support staff, including managed and professional services as well as remote providers of support to transitioning employees to set up and maintain home offices, who interface with customers to manage or support service environments and security issues, including payroll, billing, fraud, logistics and troubleshooting

10. Workers providing electronic security, fire, monitoring, and life safety services, and who ensure physical security, cleanliness, and the safety of facilities and personnel, including those who provide temporary licensing waivers for security personnel to work in other States or Municipalities.

11. Dispatchers involved with service repair and restoration

12. Retail customer service personnel at critical service center locations for onboarding customers, distributing and repairing equipment and other supply chain personnel, to support individuals' remote emergency communications needs;

13. External Affairs personnel to assist in coordinating with local, state, and federal officials to address communications needs supporting COVID-19 response, public safety, and national security.

14. Workers responsible for ensuring that persons with disabilities have access to and the benefits of various communications platforms, including those involved in the provision of telecommunication relay services, closed captioning of broadcast television for the deaf, video relay services for deaf citizens who prefer communication via American Sign Language over text, and audio-description for television programming.

**Essential Workforce - Information Technology, if remote working is not practical:**

15. Workers who support command centers, including, but not limited to Network Operations Command Centers, Broadcast Operations Control Center and Security Operations Command Centers

16. Data center operators, including system administrators, HVAC & electrical engineers, security personnel, IT managers and purchasers, data transfer solutions engineers, software and hardware engineers, and database administrators

17. Workers who support client service centers, field engineers, and other workers supporting critical infrastructure, as well as manufacturers and supply chain vendors that provide hardware and software, support services, research and development, information technology equipment (to include microelectronics and semiconductors), and HVAC and electrical equipment  for critical infrastructure and test labs and certification agencies that qualify such equipment for critical infrastructure.

18. Workers needed to pre-empt and respond to cyber incidents involving critical infrastructure,, and entities supporting the functioning of critical infrastructure sectors

19. Suppliers, designers, transporters and other workers supporting the manufacture, distribution, and construction of essential global, national and local infrastructure for computing services (including cloud computing services and teleworking capabilities), business infrastructure, financial transactions, web-based services, and critical manufacturing

April 28, 2020

20. Workers supporting communications systems, information technology, and work from home solutions
21. Employees required to support Software as a Service businesses that enable remote working, performance of business operations, distance learning, media services, and digital health offerings, or required for technical support crucial for business continuity and connectivity.

# 8. GOVERNMENT OPERATIONS AND OTHER COMMUNITY-BASED ESSENTIAL FUNCTIONS

**Essential Workforce, if remote working is not practical.**

1. Critical government workers, as defined by the employer and consistent with Continuity of Operations Plans and Continuity of Government plans.
2. County workers responsible for determining eligibility for safety net benefits
3. The Courts, consistent with <u>guidance</u> released by the California Chief Justice
4. Workers who support administration and delivery of unemployment insurance programs, income maintenance, employment service, disaster assistance, workers' compensation insurance and benefits programs, and pandemic assistance
5. Workers to ensure continuity of building functions, including but not limited to security and environmental controls, the manufacturing and distribution of the products required for these functions, and the permits and inspection for construction.
6. Elections personnel
7. Federal, State, and Local, Tribal, and Territorial employees who support Mission Essential Functions and communications networks
8. Trade Officials (FTA negotiators; international data flow administrators)
9. Weather forecasters
10. Workers that maintain digital systems infrastructure supporting other critical government operations
11. Workers who support necessary credentialing, vetting and licensing operations for critical sector workers and operations.
12. Workers who are critical to facilitating trade in support of the national, state, and local emergency response supply chain
13. Workers supporting public and private childcare establishments, pre-K establishments, K-12 schools, colleges, and universities for purposes of distance learning, provision of school meals, or care and supervision of minors to support essential workforce across all sectors
14. Staff at government offices who perform title search, notary, and recoding services in support of mortgage and real estate services and transactions;
15. Workers and instructors supporting academies and training facilities and courses for the purpose of graduating students and cadets that comprise the essential workforce for all identified critical sectors
16. Clergy for essential support and faith-based services that are provided through streaming or other technologies that support physical distancing and state public health guidelines.
17. Human services providers, especially for at risk populations, including home delivered meal providers for older adults, people with disabilities, and others with chronic health conditions; home-maker services for frail, homebound, older adults; personal assistance services providers to support activities of daily living for older adults, people with disabilities, and others with chronic health conditions who live independently in the community with supports and services; home health providers who deliver health care services for older adults, people with disabilities, and others with chronic health conditions who live independently in the community with supports and services.
18. Government entities, and contractors that work in support of local, state, and federal public health and medical mission sets, including but not limited to supporting access to healthcare and associated payment functions, conducting public health functions, providing medical care,

April 28, 2020

supporting emergency management, or other services necessary for supporting the COVID-19 response.

**Relevant Sector Guidance:**

- Schools and institutions of higher education
  - Guidance for schools (PDF)
  - Directrices para las escuelas sobre el nuevo coronavirus o COVID-19 (PDF)
  - Guidance for colleges and universities
  - Directrices para las instituciones de educación superior sobre el nuevo coronavirus o COVID-19
- Guidance for K-12 Schools: Distance Learning, School Meals, Child Care and Student Supervision
- Guidance for Using Disinfectants at Schools and Child Cares
  - Recordatorios para el uso de desinfectantes en las escuelas y guarderías
- Community care facilities, including assisted living facilities and child care

17

April 28, 2020

## 9. CRITICAL MANUFACTURING

**Sector Profile**

The Critical Manufacturing Sector identifies several industries to serve as the core of the sector: Primary Metals Manufacturing, Machinery Manufacturing, Electrical Equipment, Appliance, and Component Manufacturing, Transportation Equipment Manufacturing Products made by these manufacturing industries are essential to many other critical infrastructure sectors.

**Essential Workforce, if remote working is not practical**

1. Workers necessary for the manufacturing of metals, industrial minerals, semiconductors, materials and products needed for supply chains of the critical infrastructure sectors.
2. Workers necessary for the manufacturing of materials and products needed to manufacture medical equipment and personal protective equipment
3. Workers necessary for mining and production of critical minerals, materials and associated essential supply chains, and workers engaged in the manufacture and maintenance of equipment and other infrastructure necessary for mining production and distribution.
4. Workers who produce or manufacture parts or equipment that supports continued operations for any essential services and increase in remote workforce, including computing and communication devices, semiconductors, and equipment such as security tools for Security Operations Centers (SOCs) or data centers.
5. Workers manufacturing or providing parts and equipment that enable the maintenance and continued operation of essential businesses and facilities.

April 28, 2020

## 10.  FINANCIAL SERVICES

**Sector Profile**

The Financial Services Sector includes thousands of depository institutions, providers of investment products, insurance companies, other credit and financing organizations, and the providers of the critical financial utilities and services that support these functions. Financial institutions vary widely in size and presence, ranging from some of the world's largest global companies with thousands of employees and many billions of dollars in assets, to community banks and credit unions with a small number of employees serving individual communities. Whether an individual savings account, financial derivatives, credit extended to a large organization, or investments made to a foreign country, these products allow customers to: Deposit funds and make payments to other parties; Provide credit and liquidity to customers; Invest funds for both long and short periods; Transfer financial risks between customers.

**Essential Workforce, if remote working is not practical:**

1. Workers who are needed to process and maintain systems for processing financial transactions and services, including payment, clearing, and settlement; wholesale funding; insurance services; and capital markets activities
2. Workers who are needed to maintain orderly market operations to ensure the continuity of financial transactions and services.
3. Workers who are needed to provide business, commercial, and consumer access to banking and non-bank financial and lending services, including ATMs, lending money transmission, and to move currency, checks, securities, and payments
4. Workers who support financial operations, such as those staffing call, data and security operations centers, managing physical security, or providing accounting services.
5. Workers supporting production and distribution of debit and credit cards.
6. Workers providing electronic point of sale support personnel for essential businesses and workers.

19

## 11.   CHEMICAL & HAZARDOUS MATERIALS

**Sector Profile**

The Chemical Sector—composed of a complex, global supply chain—converts various raw materials into diverse products that are essential to modern life. Based on the product produced, the sector can be divided into five main segments, each of which has distinct characteristics, growth dynamics, markets, new developments, and issues: Basic chemicals; Specialty chemicals; Agricultural chemicals; Pharmaceuticals; Consumer products.

**Essential Workforce, if remote working is not practical:**

1. Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, workers in laboratories, workers at distribution facilities, workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, textiles, building materials, plumbing, electrical and paper products.
2. Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items
3. Workers supporting the production of protective cleaning and medical solutions, personal protective equipment, disinfectants, and packaging that prevents the contamination of food, water, medicine, among others essential products
4. Workers supporting the operation and maintenance of facilities (particularly those with high risk chemicals and/ or sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections
5. Workers who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products, including glass container manufacturing
6. Workers at nuclear facilities, workers managing medical waste, workers managing waste from pharmaceuticals and medical material production, and workers at laboratories processing test kits
7. Workers who support hazardous materials response and cleanup
8. Workers who maintain digital systems infrastructure supporting hazardous materials management operations
9. Workers who support the removal, storage, and disposal of residential and commercial solid waste and hazardous waste, including landfill and recycling operations.

April 28, 2020

## 12.    DEFENSE INDUSTRIAL BASE

**Sector Profile**

The Defense Industrial Base Sector is the worldwide industrial complex that enables research and development, as well as design, production, delivery, and maintenance of military weapons systems, subsystems, and components or parts, to meet U.S. military requirements. The Defense Industrial Base partnership consists of Department of Defense components, Defense Industrial Base companies and their subcontractors who perform under contract to the Department of Defense, companies providing incidental materials and services to the Department of Defense, and government-owned/contractor-operated and government-owned/government-operated facilities. Defense Industrial Base companies include domestic and foreign entities, with production assets located in many countries. The sector provides products and services that are essential to mobilize, deploy, and sustain military operations.

**Essential Workforce, if remote working is not practical:**

1.  Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military, including, but are not limited to, space and aerospace workers, nuclear matters workers, mechanical and software engineers (various disciplines), manufacturing and production workers, IT support, security staff, security personnel, intelligence support, aircraft and weapon system mechanics and maintainers, and sanitary workers who maintain the hygienic viability of necessary facilities.
2.  Personnel working for companies, and their subcontractors, who perform under contract or sub-contract to the Department of Defense (DoD) and the Department of Energy (DoE) (on nuclear matters), as well as personnel at government-owned/contractor operated facilities, and who provide materials and services to the DoD and DoE (on nuclear matters), including support for weapon systems, software systems and cybersecurity, defense and intelligence communications, surveillance, sale of U.S. defense articles and services for export to foreign allies and partners (as authorized by the U.S. government), and space systems and other activities in support of our military, intelligence, and space forces.

April 28, 2020

## 13.   INDUSTRIAL, COMMERCIAL, RESIDENTIAL, and SHELTERING FACILITIES AND SERVICES

**Essential Workforce, if remote working is not practical:**

1. Construction Workers who support the construction, operation, inspection, and maintenance of construction sites and construction projects (including housing, commercial, and mixed-use construction); and workers who support the supply chain of building materials from production through application/installation, including cabinetry, fixtures, doors, cement, hardware, plumbing, electrical, heating/cooling, refrigeration, appliances, paint/coatings, and employees who provide services that enable repair materials and equipment for essential functions.
2. Workers such as plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, construction material sources, and essential operation of construction sites and construction projects (including those that support such projects to ensure the availability of needed facilities, transportation, energy and communications; and support to ensure the effective removal, storage, recycling and disposal of solid waste and hazardous waste)
3. Workers such as plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, businesses, and buildings such as hospitals and senior living facilities, including any facility supporting COVID-19 response.
4. Workers who support the supply chain of building materials from production through application and installation, including cabinetry, fixtures, doors, cement, hardware, plumbing (including parts and services), electrical, heating and cooling, refrigeration, appliances, paint and coatings, and workers who provide services that enable repair materials and equipment for essential functions.
5. Workers in hardware and building materials stores, consumer electronics, technology and appliances retail, and related merchant retailers, wholesalers and distributors that support essential workforce functions where sales and operations cannot be conducted online
6. Warehouse operators, including vendors and support personnel critical for business continuity (including heating, ventilation, and air conditioning (HVAC) and electrical engineers, security personnel, and janitorial staff), e-commerce or online commerce, and customer service for essential functions.
7. Workers supporting the operations of commercial buildings that are critical to safety, security, and the continuance of essential activities, such as on-site property managers, building engineers, security staff, fire safety directors, janitorial personnel, and service technicians (e.g., mechanical, HVAC, plumbers, electricians, and elevator).
8. Workers supporting ecommerce through distribution, warehouse, call center facilities, and other essential operational support functions, that accept, store, and process goods, and that facilitate their transportation and delivery
9. Workers distributing, servicing, repairing, installing residential and commercial HVAC systems, boilers, furnaces and other heating, cooling, refrigeration, and ventilation equipment.
10. Workers managing or servicing hotels or other commercial and residential buildings that are used for COVID-19 mitigation and containment measures, treatment measures, provide accommodation for essential workers, or providing housing solutions, including measures to protect homeless populations.

April 28, 2020

11. Workers responsible for the leasing of residential and commercial properties to provide individuals and families with ready access to available housing.
12. Residential and commercial real estate workers, limited to scheduled property viewings to a potential buying party. This does not extend to open-house viewings, nor viewings with more than one buying party at a time.
13. Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities and critical sector services
14. Workers responsible for handling property management, maintenance, and related service calls who can coordinate the response to emergency "at-home" situations requiring immediate attention, as well as facilitate the reception of deliveries, mail, and other necessary services.
15. Workers supporting the entertainment industries, studios, and other related establishments, provided they follow covid-19 public health guidance around physical distancing.
16. Workers that provide or determine eligibility for food, shelter, in-home supportive services, child welfare, adult protective services and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals (including family members)
17. Workers performing services in support of the elderly and disabled populations who coordinate a variety of services, including health care appointments and activities of daily living.
18. Workers who provide support to vulnerable populations to ensure their health and well-being including family care providers.
19. Workers providing dependent care services, particularly those whose services ensure essential workers can continue to work.
20. Workers who support food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, such as those residing in shelters.
21. Workers in laundromats, laundry services, and dry cleaners.
22. Workers providing disinfection services, for all essential facilities in essential sectors
23. Workers necessary for the installation, maintenance, distribution, and manufacturing of water and space heating equipment and its components.
24. Support required for continuity of services, including commercial disinfectant services, janitorial/cleaning personnel, and support personnel functions that need freedom of movement to access facilities in support of front-line employees.

**Relevant Sector Guidance:**

- Cleaning & Waste Management for Residences 2/2020
- Essential/Emergency Personnel Providing Critical In-Home Services
- Home cleaning with COVID-19 positive individuals
- Recommended Strategic Approaches for COVID-19 Response for Individuals Experiencing Homelessness
- Flow Chart: COVID-19 Recommended Protocol for People Experiencing Homelessness
- Homeless Assistance Providers
- Immigrant Communities
  - Las Comunidades de Inmigrantes
- Pets & People

23

EXHIBIT 3



BUSINESS, CONSUMER SERVICES, AND HOUSING AGENCY ● GAVIN NEWSOM, GOVERNOR
**DEPARTMENT OF CONSUMER AFFAIRS ● BOARD OF BARBERING AND COSMETOLOGY**
P.O. Box 944226, Sacramento, CA 94244-2260
Phone: (800) 952-5210   Email: barbercosmo@dca.ca.gov
Website: www.barbercosmo.ca.gov



May 1, 2020

The Board of Barbering and Cosmetology acknowledges and is sympathetic to the ever-changing environment that the Coronavirus (COVID-19) pandemic has created for our licensees. Our role is to ensure the health and safety of California consumers by promoting ethical standards and by enforcing the laws of the barbering and beauty industry. For the safety of our consumers and our licensees, the Board continues to urge licensees to abide by the Governor's stay at home order.

We have heard of businesses disregarding the stay at home orders. If businesses continue to put public health and safety at risk by not following the state and local shelter in place orders, and if circumstances warrant it, the Board may pursue disciplinary action against their license. This will not be taken lightly.

The Board is drafting a Returning to Work Checklist for establishments for when licensees are able to reopen safely. We want to make sure we are able to maintain consumer protection and help guide our licensees when the time is appropriate and directed by the Governor.

Again, the Board fully supports the Governor's stay at home order and we expect our licensees to comply.


We thank you for your understanding and patience during this time.

# EXHIBIT 4



# BELLUS HEALTH & SAFETY LEARNING

California

## STATE BOARD OF CALIORNIA GUIDELINES

- 440 Page Health and Safety Book includes training in:
    - Board Introduction
    - Inspection expectations
    - 10 common violations
    - Chemicals and Professionals Health
    - Safety Data Sheets
        - Risk Phrases
        - Resources
        - Safe Working for Salon/Spa Professional
    - Professional Protecting themselves from Hazardous Chemicals
    - Ergonomics
    - Communicable Diseases
        - Diseases in the Workplace
    - Health and Safety Laws and Agencies
        - Health and Safety Rights: Facts for CA workers
    - Solving Health and Safety Problems
        - Health Survey
        - Workplace Inspection Checklist
        - Resources Agencies and Materials Information
    - Workers' Rights

## BELLUS ACADEMY TRAINING

- Barbering
    - Microbiology
        - Bacteria and Viruses
            - Types and Classifications
            - Growth and Reproduction
            - Difference between
        - External Parasites
            - Types that prevent salon services
        - Infection
        - Immunity
            - 2 Ways the body fights infection
        - Universal Precautions
    - Infection Control
        - Cleaning, Disinfection and Sterilization
            - Differences between
        - Method for Tools and Multi Use Supplies



BELLUS HEALTH & SAFETY

- Efficacy
- Infection Control Procedures
  - Proper Hand Washing
  - Blood Exposure Incident
- Ventilation Guidelines
- Safety Data Sheets
- Disinfectants
  - Types
  - Guidelines
  - Precautions
  - First Aid
    - Bleeding and Wounds
    - Burns
    - Choking
    - Fainting
    - Eye Injury
- Cosmetology
  - Microbiology
    - Bacteria and Viruses
      - Types and Classifications
      - Growth and Reproduction
      - Difference between
    - External Parasites
      - Types that prevent salon services
    - Infection
    - Immunity
      - 2 Ways the body fights infection
    - Universal Precautions
  - Infection Control
    - Cleaning, Disinfection and Sterilization
      - Differences between
    - Method for Tools and Multi Use Supplies
    - Efficacy
    - Infection Control Procedures
      - Proper Hand Washing
      - Blood Exposure Incident
    - Ventilation Guidelines
    - Safety Data Sheets
    - Disinfectants
      - Types
      - Guidelines
      - Precautions
  - First Aid
    - Bleeding and Wounds
    - Burns

BELLUS HEALTH & SAFETY



- ▪ Choking
- ▪ Fainting
- ▪ Eye Injury
- Esthetics
  - o Explaining Infection Control
  - o Federal and State Regulatory Agencies
  - o Recognizing Principles of Infection
  - o Identifying Different Types of Pathogens
  - o Employ Principles of Prevention
  - o Follow Standard Precautions to Protect Self and Client
  - o Demonstrate Safe Work Practices and Safety Precautions
  - o Apply Infection Control
  - o Demonstrations and Practical Process of:
    - ▪ Proper Hand Washing
    - ▪ Cleaning and Disinfecting non-porous reusable implements
    - ▪ Handling an Exposure Incident
      - Client Injury
      - Employee Injury
- Massage
  - o Know the Paths of Disease and Infection
    - ▪ Microorganisms
    - ▪ Immunity
  - o Maintain Infection Control
    - ▪ Terminology
    - ▪ Cleaning
    - ▪ Disinfecting
    - ▪ Safety Data Sheets
    - ▪ Antiseptics
    - ▪ Standard Precautions
    - ▪ An Exposure Incident: Contact with Blood or Body Fluids
    - ▪ Disinfectant Containers
    - ▪ Disinfectants
    - ▪ Proper Practices for Cleaning and Disinfecting
  - o Follow Safety Practices and Procedures for Massage Therapists
    - ▪ The Facilities
    - ▪ Equipment
    - ▪ Fire Safety
    - ▪ First Aid
    - ▪ Heat and Ventilation
    - ▪ Practitioners Personal Safety
    - ▪ Client Safety
  - o Proper Hand Washing Technique
- Spa Nails
  - o Microbiology
    - ▪ Bacteria and Growth



BELLUS HEALTH & SAFETY

- Viruses
- External Parasites
- Infection
- Immunity
  - o Infection Control
    - Sanitation-Cleaning
    - Disinfection
    - Sterilization
    - Equipment
  - o Safety and First Aid
    - Electrical Safety
    - Chemical Safety
    - Allergic Reactions
    - Bleeding and Wounds
    - Burns
    - Choking
    - Fainting
    - Eye Injury

EXHIBIT 5

## *16 CCR 977*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY*

# § 977. Health and Safety Definitions

The following words and terms, when used in this article, shall have the following meanings:

Autoclave -- A device used to sterilize tools, equipment and supplies by subjecting them to high pressure saturated steam.

Over-the-Counter -- Cosmetology, barbering or electrology products that are made available for purchase by the general public without a physician's prescription.

Cosmetics -- Substances used to enhance the appearance of the human body.

Contaminated -- The presence of blood or other potentially infectious materials on an item's surface or visible debris such as dust, hair and skin.

Dermis -- The layer of skin just below the epidermis; the living layer of the skin.

Disinfect or Disinfection -- The use of chemicals to destroy harmful bacteria, viruses and pathogens on implements or tools to render them safe for use.

Disinfectant -- A product registered by the U.S. Environmental Protection Agency (EPA) that has demonstrated bactericidal, fungicidal and virucidal activity. The products used must include a label from the manufacturer that indicates the EPA registration and must be in liquid form to disinfect non-electrical tools and spray or wipe form to disinfect electrical tools and shears.

Dry Heat Sterilizer -- A device used to sterilize equipment and supplies by use of hot air that is nearly or completely free of water vapor.

Epidermis -- The outermost layer of the skin; the non-living layer of the skin.

Electrical Tools -- All tools used for barbering, cosmetology and electrology that require electricity to operate by means of an electrical cord, wireless charger, or battery. These include, but are not limited to clippers, blow dryers, curling irons and flat irons.

Foot Basin -- On a footspa chair, the open vessel that is filled with water and in which the client's feet are placed during a pedicure.

Hot Styling Tools -- Tools that utilize heat to style hair.

Non-Electrical Tools -- All tools used for barbering, cosmetology and electrology that do not use any form of electricity to operate. These include, but are not limited to shears, razors, cuticle nippers, cuticle pushers, nail clippers, metal files, metal smoothers, combs and hair clips.

Poisonous -- A substance that can cause sickness or death by entering or touching the body.

Sanitary -- A clean, healthy condition.

Soiled -- dirty; not clean.

Sterilize or Sterilization -- The process which removes or kills all forms of microbial life, including transmissible agents (such as fungi, bacteria, viruses and spore forms) by use of an autoclave or dry heat sterilizer.

Tub -- A standalone, open vessel that is filled with water and in which the client's feet are placed during a pedicure.

# Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

# History

**HISTORY:**

1. New section filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13). For prior history, see Register 94, No. 43.

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

*16 CCR 978*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 978. Minimum Equipment and Supplies

**(a)** Establishments and schools shall have and maintain the following minimum equipment and supplies:

**(1)** If hair services are performed, at least one covered waste container per establishment for the disposal of hair. Hair must be disposed of in a covered waste container.

**(2)** Closed containers to hold all soiled towels, gowns, smocks, linens and sheets in any enclosed area frequented by the public.

**(3)** Closed, clean cabinets, drawers, or containers to hold all clean non-electrical tools, towels, gowns, smocks, linens and sheets.

**(4)** Containers for disinfectant solution for tools and equipment to be disinfected. Containers must be labeled "Disinfectant Solution".

**(5)** Each container specified in (4) shall contain sufficient disinfectant solution to allow for the total immersion of tools.

**(6)** If electrolysis is performed, an autoclave or dry heat sterilizer that meets the requirements of Section 982.

**(b)** Establishments and schools shall have disinfectant solution, mixed according to manufacturer's directions, available for use at all times.

**(c)** A manufacturer-labeled container for the disinfectant used must be available at all times in the establishment or school. In the event that the last remaining disinfectant has been used, the empty manufacturer-labeled container must be present.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

16 CCR 978

**HISTORY:**

1. New article 12 and repealer and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 84, No. 28.

2. Amendment of subsections (a)(1) and (a)(3) filed 12-2-96; operative 1-1-97 (Register 96, No. 49).

3. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 979*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 979. Disinfecting Non-Electrical Tools

**(a)**  Before use upon a client, all non-electrical tools that can be disinfected, excluding shears, shall be disinfected in the following sequential manner:

   **(1)**  Remove all visible debris.

   **(2)**  Clean with soap or detergent and water.

   **(3)**  Completely dry tools with a new, clean paper towel

   **(4)**  Then totally immerse in an EPA-registered disinfectant with demonstrated bactericidal, fungicidal, and virucidal activity, used according to manufacturer's instructions.

   **(5)**  Licensees or students shall wear protective gloves or use tongs when removing tools from the disinfectant.

**(b)**  The disinfectant solutions specified in subdivision (a) shall:

   **(1)**  Remain covered at all times.

   **(2)**  Be changed according to the manufacturer's instructions or when it is cloudy or contains debris.

**(c)**  All tools used on a client or soiled in any manner shall be placed in a container labeled "Dirty", "Soiled", or "Contaminated".

**(d)**  All disinfected tools shall be stored in a clean, covered place which is labeled "Clean" or "Disinfected".

**(e)**  Disinfected tools shall not be placed in a container, pouch or holder which cannot be disinfected.

**(f)**  Shears shall be disinfected according to the following sequential procedures:

   **(1)**  Remove all visible debris.

   **(2)**  Clean with soap or detergent and water.

   **(3)**  Spray or wipe the shear with an EPA-registered disinfectant with demonstrated bactericidal, fungicidal, and virucidal activity, used according to manufacturer's instructions.

**(g)**  Disinfected shears shall not be placed in a container, pouch or holder which cannot be disinfected.

**(h)**  If tools specified in this section are sterilized in accordance with the requirements outlined in Section 982, the requirements of this section will be deemed to have been met.

## Statutory Authority

**AUTHORITY:**

  Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

  1. Repealer and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 90, No. 47.

  2. Amendment of subsections (a)(2) and (d) filed 12-2-96; operative 1-1-97 (Register 96, No. 49).

  3. Amendment of section heading and section filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Copyright © 2020by Barclays Law Publishers All rights reserved

End of Document

## *16 CCR 980*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 980. Disinfecting Electrical Tools

**(a)** Clippers, and other electrical tools shall be disinfected prior to each use in the following sequential manner:

**(1)** First removing all visible debris; and

**(2)** Disinfect with an EPA-registered disinfectant spray or wipe with demonstrated bactericidal, fungicidal, and virucidal activity used according to manufacturer's instructions.

**(b)** All disinfected electrical tools shall be stored in a clean place.

**(c)** All soiled electrical tools used on a client, or soiled in any manner, shall be placed in a container labeled "Soiled", "Dirty" or "Contaminated" (excluding hot styling tools).

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

1. Repealer and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 88, No. 38.

2. Amendment of subsection (b) filed 12-2-96; operative 1-1-97 (Register 96, No. 49).

3. Amendment of section heading and section filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

16 CCR 980

**End of Document**

## *16 CCR 980.1*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 980.1. Procedures for Cleaning and Disinfecting Whirlpool Footspas, and Air-Jet Basins

**(a)**  As used in this section, "whirlpool footspa" or "spa" is defined as any basin using circulating water.

**(b)**  An air-jet basin is defined as any basin using an air jet stream system to move water.

**(c)**  After use upon each client, each whirlpool footspa or air-jet basin shall be cleaned and disinfected in the following sequential manner:

**(1)**  All water shall be drained from the basin.

**(2)**  The inside walls of the basin shall be scrubbed and cleaned of all visible debris with a clean brush, liquid soap (labeled as such on soap product) and water.

**(3)**  The spa basin shall be rinsed with water.

**(4)**  The spa basin shall be refilled with clean water.

**(5)**  The water in the basin shall be circulated with the correct amount (read manufacturer label for mixing instructions) of the EPA-registered hospital-liquid disinfectant that is labeled as a bactericide, fungicide and virucide, through the basin for at least 10 minutes.

**(6)**  The spa basin must be drained, rinsed, and wiped dry with a new, clean paper towel.

**(7)**  Record this procedure in the pedicure equipment-cleaning log. The log shall contain the date and time of each cleaning, initials of the person who completed the procedure, and shall indicate that the cleaning was done after a client.

**(d)**  At the end of each day and after the last client, each whirlpool footspa or air-jet basin shall be cleaned and disinfected in the following sequential manner:

**(1)**  The screen and any other removable parts shall be removed.

**(2)**  Scrub all visible debris from the screen, inside walls of the basin, any other removable parts, and the area behind them with a clean brush, liquid soap (labeled as such on soap product) and water.

**(3)**  Reinsert the clean screen and any other removable parts.

**(4)** Fill the basin with warm water and detergent (labeled as such on detergent product) and circulate the detergent through the spa system for at least 10 minutes (follow the spa manufacturer's instructions).

**(5)** Drain the detergent solution and rinse the basin.

**(6)** Refill the basin with clean water and circulate the correct amount (read the label for mixing instructions) of the EPA-registered hospital-liquid disinfectant which the label claims is a bactericide, fungicide, and virucide through the basin for at least 10 minutes.

**(7)** Drain, rinse and wipe the basin dry with a new, clean paper towel and allow basin to dry completely.

**(8)** Record this procedure in the pedicure equipment-cleaning log. The log shall contain the date and time of each cleaning, initials of the person who completed the procedure, and shall indicate that the cleaning was done at the end of the day.

**(e)** At least once each week, after completing the procedures provided in subsection (d) (1 through 6), each whirlpool footspa and air-jet basin shall not be drained and the following sequential procedures shall be followed:

**(1)** Do not drain the disinfectant solution. The unit shall be turned off and the disinfecting solution shall be left undisturbed in the unit for at least 6 hours.

**(2)** After the disinfectant solution has been sitting at least 6 hours, drain and rinse the basin with clean water.

**(3)** Refill the basin with clean water and flush the system.

**(4)** Record this procedure in the pedicure equipment-cleaning log. The log shall contain the date and time of each cleaning, initials of the person who completed the procedure, and shall indicate that the cleaning was done weekly.

**(f)** The pedicure equipment-cleaning log shall be made available upon request by either a client or a board representative.

**(g)** A whirlpool footspa "Not in Service" must have a notation on the pedicure equipment-cleaning log that the footspa is not in service. The footspa must have a "Not in Service" sign displayed upon the chair and be kept in a sanitary condition.

**(h)** A violation of this section may result in an administrative fine and/or disciplinary action. Each whirlpool footspa or air-jet basin not in compliance with this section may result in a separate violation.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

1. New section filed 5-16-2001 as an emergency; operative 5-16-2001 (Register 2001, No. 20). A Certificate of Compliance must be transmitted to OAL by 9-13-2001 or emergency language will be repealed by operation of law on the following day.

2. New section refiled 9-13-2001 as an emergency; operative 9-13-2001 (Register 2001, No. 37). A Certificate of Compliance must be transmitted to OAL by 1-11-2002 or emergency language will be repealed by operation of law on the following day.

3. Repealed by operation of *Government Code section 11346.1(g)* (Register 2002, No. 3).

4. New section refiled 1-14-2002 as an emergency; operative 1-14-2002 (Register 2002, No. 3). A Certificate of Compliance must be transmitted to OAL by 5-14-2002 or emergency language will be repealed by operation of law on the following day.

5. Certificate of Compliance as to 1-14-2002 order, including amendment of section, transmitted to OAL 4-16-2002 and filed 5-29-2002 (Register 2002, No. 22).

6. Amendment of section heading and section filed 12-18-2006 as an emergency; operative 12-18-2006 (Register 2006, No. 51). A Certificate of Compliance must be transmitted to OAL by 4-17-2007 or emergency language will be repealed by operation of law on the following day.

7. Certificate of Compliance as to 12-18-2006 order transmitted to OAL 4-17-2007 and filed 5-30-2007 (Register 2007, No. 22).

8. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Copyright © 2020by Barclays Law Publishers All rights reserved

End of Document

*16 CCR 980.2*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 980.2. Procedures for Cleaning and Disinfecting Pipe-Less Footspas

**(a)**  As used in this section, "pipe-less" footspa is defined as any unit with footplates, impellers, impeller assemblies and propellers.

**(b)**  After use upon each client, each pipe-less footspa shall be cleaned and disinfected in the following sequential manner:

**(1)**  All water shall be drained from the spa basin.

**(2)**  Remove footplate, and any other removable components according to the manufacturer's instructions.

**(3)**  Scrub all visible debris from the impeller, footplate, inside walls of the basin, and other components and the areas behind or under each with a clean brush, liquid soap (labeled as such on soap product) and water. Rinse with clean water.

**(4)**  Reinsert the properly cleaned footplate, and other components.

**(5)**  Refill the basin with clean water and circulate the correct amount (read the label for mixing instructions) of the EPA-registered hospital-liquid disinfectant which the label claims is a bactericide, fungicide, and virucide, through the basin for at least 10 minutes.

**(6)**  Drain, rinse and wipe the basin dry with a new, clean paper towel.

**(7)**  Record this procedure in the pedicure equipment-cleaning log. The log shall contain the date and time of each cleaning, initials of the person who completed the procedure, and shall indicate that the cleaning was done after a client.

**(c)**  At the end of every day and after performing the procedures provided in subsection (b) (1 through 7) and after the last client, each pipe-less footspa shall be cleaned and disinfected in the following sequential manner:

**(1)**  Fill the basin with warm water and detergent (labeled as such on detergent product) and circulate the detergent through the spa system for at least 10 minutes (follow manufacturer's instructions).

**(2)**  Drain the detergent solution and rinse the basin.

**(3)** Refill the basin with clean water and circulate the correct amount (read the label for mixing instructions) of the EPA-registered hospital-liquid disinfectant which the label claims is a bactericide, fungicide, and virucide, through the basin for at least 10 minutes.

**(4)** Drain, rinse and wipe the basin dry with a new, clean paper towel.

**(5)** Allow the basin to dry completely.

**(6)** Record this procedure in the pedicure equipment-cleaning log. The log shall contain the date and time of each cleaning, initials of the person who completed the procedure, and shall indicate that the cleaning was done at the end of the day.

**(d)** At least once each week, after completing the procedures provided in subsection (c) (1 through 3), and the disinfectant solution in each pipe-less footspa shall not be drained and the following sequential procedures shall be followed:

**(1)** The unit shall be turned off and the disinfecting solution shall be left in the unit undisturbed for at least 6 hours.

**(2)** After the disinfectant solution has been sitting at least 6 hours, rinse and wipe the basin dry with a new, clean paper towel.

**(3)** Record this procedure in the pedicure equipment-cleaning log. The log shall contain the date and time of each cleaning, initials of the person who completed the procedure, and shall indicate that the cleaning was done weekly.

**(e)** The pedicure equipment-cleaning log shall be made available upon request by either a client or a board representative.

**(f)** A whirlpool footspa "Not in Service" must have a notation on the pedicure equipment-cleaning log that the footspa is not in service. The footspa must have a "Not in Service" sign displayed upon the chair and be kept in a sanitary condition.

**(g)** A violation of this section may result in an administrative fine and/or disciplinary action. Each pipe-less footspa not in compliance with this section may result in a separate violation.

## Statutory Authority

**AUTHORITY:**

  Note: Authority cited: *Sections 7312 and 7406, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

  1. New section filed 12-18-2006 as an emergency; operative 12-18-2006 (Register 2006, No. 51). A Certificate of Compliance must be transmitted to OAL by 4-17-2007 or emergency language will be repealed by operation of law on the following day.

16 CCR 980.2

2. Certificate of Compliance as to 12-18-2006 order transmitted to OAL 4-17-2007 and filed 5-30-2007 (Register 2007, No. 22).

3. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 980.3*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 980.3. Procedures for Cleaning and Disinfecting Non-Whirlpool Foot Basins or Tubs

**(a)**  As used in this section, "non-whirlpool foot basins" or "tubs" are defined as any basin, tub, footbath, sink, bowl, and all non-electrical equipment that holds water for a client's feet during a pedicure service.

**(b)**  After use upon each client, each non whirlpool foot basin or tub shall be cleaned and disinfected in the following sequential manner:

**(1)**  All water shall be drained from the foot basin or tub.

**(2)**  The inside surfaces of the foot basin or tub shall be scrubbed and cleaned of all visible debris with a clean brush, liquid soap (labeled as such on soap product) and water.

**(3)**  The foot basin or tub shall be rinsed with clean water.

**(4)**  Refill the foot basin or tub with clean water and the correct amount (read the label for mixing instructions) of the EPA-registered hospital-liquid disinfectant which the label claims is a bactericide, fungicide, and virucide. Leave the disinfecting solution in the foot basin or tub for at least 10 minutes.

**(5)**  Drain, rinse and wipe the basin dry with a new, clean paper towel.

**(6)**  Record this procedure in the pedicure equipment-cleaning log. The log shall contain the date and time of each cleaning, initials of the person who completed the procedure, and shall indicate that the cleaning was done after a client.

**(c)**  The pedicure equipment-cleaning log shall be made available upon request by either a client or a board representative.

**(d)**  A violation of this section may result in an administrative fine and/or disciplinary action. Each non-whirlpool foot basin or tub not in compliance with this section may result in a separate violation.

**(e)**  All disinfected basins or tubs shall be stored in a clean, covered place labeled "Clean" or "Disinfected".

## Statutory Authority

16 CCR 980.3

**AUTHORITY:**

Note: Authority cited: *Sections 7312 and 7406, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

1. New section filed 12-18-2006 as an emergency; operative 12-18-2006 (Register 2006, No. 51). A Certificate of Compliance must be transmitted to OAL by 4-17-2007 or emergency language will be repealed by operation of law on the following day.

2. Certificate of Compliance as to 12-18-2006 order transmitted to OAL 4-17-2007 and filed 5-30-2007 (Register 2007, No. 22).

3. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 980.4*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY*

## § 980.4. Disposable Foot Basin or Tub Liners

**(a)**  Single use, disposable, recyclable, liners designed specifically and manufactured for use as a foot basin or tub liner shall be disposed of immediately after each use and may not be disinfected or reused.

**(1)**  After disposal of the pedicure basin liner the basin or tub shall be scrubbed and cleaned of all visible debris with a clean brush and liquid soap (labeled as such on soap product) and water. The foot basin or tub shall be rinsed with clean water and wiped dry with a new, clean paper towel.

**(2)**  Record the cleaning procedure in the pedicure equipment-cleaning log. The log shall contain the date and time of each cleaning, initials of the person who completed the procedure, and shall indicate that the cleaning was done after a client.

**(3)**  The pedicure equipment-cleaning log shall be made available upon request by either a client or a board representative.

**(4)**  Establishments or schools that utilize the liners must maintain a supply of five (5) liners per foot tub basin for use at all times.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Sections 7312 and 7406, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

1. New section filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

16 CCR 980.4

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 981*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 981. Tools and Supplies

**(a)**  All tools and supplies which come into direct contact with a client and cannot be disinfected (including, but not limited to buffers, pumice stones, wax sticks, toe separators, gloves, cotton pads, sponges, emery boards, and neck strips) shall be disposed of in a waste container immediately after use on a single client.

**(b)**  New supplies and single-use, disposable tools shall be stored in a clean, covered place labeled "New".

**(c)**  No person working or training in an establishment or school shall be permitted to carry any tools or supplies in or on a garment or uniform (including pouches and holsters) while practicing any of the acts as defined in *Section 7316 of the Business and Professions Code*.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

1. Repealer and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 88, No. 38.

2. Amendment of section heading and section filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

16 CCR 981

**End of Document**

## *16 CCR 982*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY*

## § 982. Sterilizing Electrolysis Tools

**(a)** Before use upon a client in schools and establishments, all electrolysis tools that can be sterilized, excluding single-use, pre-sterilized, disposable needles/wire filaments, shall be sterilized by one of the following methods:

**(1)** Clean with soap or detergent and water (which may include the use of ultrasonic equipment) and then sterilized by one of the following methods:

**(A)** Autoclave, registered and listed with the U.S. Food and Drug Administration (FDA), used according to manufacturer's instructions.

**(B)** Dry heat sterilizer, registered and listed with the U.S. Food and Drug Administration (FDA), used according to manufacturer's instructions.

**(C)** Chemical (color change) indicators must be used on each sterilized package to indicate the sterilization process was completed.

**(2)** All sterilized tools shall remain in the package they were sterilized in until ready for use. This package must be undamaged and labeled "Sterilized" or "Sterilization".

**(3)** All tools that have been used on a client or soiled in any manner shall be placed in a container labeled "Dirty," "Soiled" or "Contaminated."

**(4)** Sterilization equipment shall be checked weekly to ensure that it is reaching the temperature required by manufacturer's instructions.

**(b)** Single-use, pre-sterilized, disposable electrolysis needles/wire filaments must be placed in a puncture resistant sharps container immediately after use, when contaminated before use, or when opened and found damaged. The sharps container must be changed when not more than three-quarters filled and disposed of as biohazardous waste.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

16 CCR 982

# History

**HISTORY:**

1. New section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 88, No. 38.

2. Amendment of section heading and section filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Copyright © 2020by Barclays Law Publishers All rights reserved

End of Document

*16 CCR 982.1*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY*

## § 982.1. Emery Boards. [Repealed]

## History

**HISTORY:**

1. New section filed 9-26-56; effective thirtieth day thereafter (Register 56, No. 18).

2. Repealer filed 1-23-61; effective thirtieth day thereafter (Register 61, No. 2).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 983*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY*

## § 983. Personal Cleanliness

**(a)** The attire of a licensee or student serving a client shall at all times be clean.

**(b)** Every licensee or student performing services shall thoroughly wash his or her hands with soap and water or any equally effective alcohol-based hand-cleaning product immediately before serving each client.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

1. New section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 84, No. 28.

2. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 984*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY*

## § 984. Disease and Infestation

**(a)** No establishment or school shall knowingly permit a licensee or student afflicted with an infection or parasitic infestation capable of being transmitted to a client to serve clients or train in the establishment or school.

**(b)** No establishment or school shall knowingly require or permit a licensee or student to work upon a client with an infection or parasitic infestation capable of being transmitted to the licensee or student.

**(c)** Infections or parasitic infestation capable of being transmitted between licensee or student and client include, but are not limited to, the following:

  - Cold, influenza or other respiratory illness accompanied by a fever, until 24 hours after resolution of the fever.

  - Streptococcal pharyngitis ("Strep throat"), until 24 hours after treatment has been initiated, and 24 hours after resolution of fever.

  - Purulent conjunctivitis ("pink eye"), until examined by a physician or other licensed clinician and approved for return to work.

  - Pertussis ("whooping cough"), until five days of antibiotic therapy has been completed.

  - Varicella ("chicken pox"), until the sixth day after onset of rash or sooner if all lesions have dried and crusted.

  - Mumps, until nine days after onset of parotid gland swelling.

  - Tuberculosis, until a local health department authority states that the individual is noninfectious.

  - Impetigo (bacterial skin infection), until 24 hours after treatment has begun.

  - Pediculosis (head lice), until the morning after first treatment.

  - Scabies ("crabs"), until after treatment has been completed.

**(d)** Blood-borne diseases, such as HIV/AIDS and hepatitis B (HBV), shall not be considered infectious or communicable diseases for the purpose of this section.

**(e)** No person working or training in an establishment or school shall perform services upon a surface of the skin or scalp where such skin is inflamed, or broken (e.g., abraded, cut) or where a skin infection or eruption is present; nor shall a person working or training in an establishment or

school perform services if the skin of his or her hands is inflamed, or broken, or where a skin infection or eruption is present, without wearing gloves.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*; and *Section 121365, Health and Safety Code*.

## History

**HISTORY:**

1. Repealer and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 80, No. 13.

2. Amendment of section and Note filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## 16 CCR 985

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 985. Neck Strips

A sanitary neck strip or towel shall be used to keep the protective covering, such as client capes, from coming in direct contact with a client's neck.

## Statutory Authority

### AUTHORITY:

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

### HISTORY:

1. New section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 84, No. 28.

2. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

End of Document

## *16 CCR 985.5*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY*

## § 985.5. Handling and Storage of Wigs. [Repealed]

## Statutory Authority

### AUTHORITY:

Note: Authority cited: *Section 7311, Business and Professions Code*. Reference: Sections *7310*, *7311, Business and Professions Code*.

## History

### HISTORY:

1. New section filed 3-29-72; effective thirtieth day thereafter (Register 72, No. 14).

2. Amendment filed 3-28-80; effective thirtieth day thereafter (Register 80, No. 13).

3. Repealed filed 7-10-84; effective thirtieth day thereafter (Register 84, No. 28).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

*16 CCR 986*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 986. Neck Dusters and Brushes

**(a)**  Before use on a client, neck or nail dusters and all other manicure brushes that are used in an establishment or school on a client shall be cleaned in the following sequential manner:

**(1)**  Remove all visible debris.

**(2)**  Clean with soap or detergent and water.

**(3)**  Dry dusters or brushes.

**(4)**  Store all clean dusters or brushes in a clean, covered place which is labeled "Clean".

**(5)**  All dusters or brushes used on a client or soiled in any manner shall be placed in a container labeled "Dirty", "Soiled" or "Contaminated".

**(b)**  Before use on a client, natural fiber, facial, acrylic, gel, nail-art, and makeup brushes used in an establishment or school, on a client, shall be cleaned in the following sequential manner:

**(1)**  Remove all visible debris.

**(2)**  Clean by using a cleansing agent(s) such as: monomer, makeup brush liquid/spray cleaner, alcohol.

**(3)**  Dry brushes.

**(4)**  Store all clean brushes in a clean, covered place which is labeled "Clean".

**(5)**  All brushes used on a client or soiled in any manner shall be placed in a container labeled "Dirty", "Soiled" or "Contaminated".

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

1. Repealer of article 8 and section and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 69, No. 23.

2. Amendment of section and Note filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Copyright © 2020by Barclays Law Publishers All rights reserved

End of Document

## *16 CCR 986.1*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 986.1. Posting of Consumer Information Message. [Repealed]

## Statutory Authority

### AUTHORITY:

Note: Authority cited: *Section 7310, Business and Professions Code*. Reference: *Sections 129(e), 7308(d) and 7431, Business and Professions Code*.

## History

### HISTORY:

1. New section filed 6-13-90; operative 7-13-90 (Register 90, No. 32).

2. Editorial correction of printing error in subsection (b) (Register 91, No. 30).

3. Repealer filed 10-24-94; operative 11-23-94 (Register 94, No. 43).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 986.5*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY*

## § 986.5. Display of License. [Repealed]

## History

HISTORY:

  1. Amendment filed 2-16-71; effective thirtieth day thereafter (Register 71, No. 8). For prior history, see Register 68, No. 14.

  2. Amendment filed 10-15-74; effective thirtieth day thereafter (Register 74, No. 42).

  3. Repealer filed 7-10-84; effective thirtieth day thereafter (Register 84, No. 28).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 987*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 987. Towels

**(a)**  After a towel, sheet, robe, linen or smock has been used once, it shall be deposited in a closed container and not used until properly laundered and sanitized.

**(b)**  Towels, sheets, robes, linens and smocks shall be laundered either by regular commercial laundering or by a noncommercial laundering process which includes immersion in water at least 160o F for not less than twenty-five (25) minutes during the washing or rinsing operation. Alternately, it is acceptable if the commercial laundry opts to use chemicals and cold water to reduce organisms on laundry, provided the laundry follows manufacturers' instructions for washing machines, dryers, detergents, rinse aids, and other additives. The laundry detergents used are not required to have stated antimicrobial claims.

**(c)**  All clean towels, sheets, robes, linens and smocks shall be stored in clean, closed cabinets or a clean, closed container.

## Statutory Authority

**AUTHORITY:**

 Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

 1. New section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 84, No. 28.

 2. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

16 CCR 987

**End of Document**

*16 CCR 988*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 988. Liquids, Creams, Powders and Cosmetics

**(a)**  All liquids, creams, waxes, shampoos, gels and other cosmetic preparations shall be kept in clean, closed containers. Powders may be kept in clean shakers.

**(b)**  All bottles and containers shall be distinctly and correctly labeled to disclose their contents. All bottles and containers containing poisonous substances shall be additionally and distinctly marked as such. Poisonous substances that are maintained in the manufacturer-labeled container are not required to have additional labeling.

**(c)**  When only a portion of a cosmetic preparation is to be used on a client, it shall be removed from the bottle or container in such a way as not to contaminate the remaining portion.

**(1)**  This provision does not apply to cosmetic preparations that have been demonstrated to be unlikely to transmit pathogens, (e.g. nail polish, artificial nail monomer liquids).

**(d)**  Pencil cosmetics shall be sharpened before each use.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

1. Repealer and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 62, No. 25.

2. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

16 CCR 988

Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 989*

This document is current through Register 2020, No. 17, April 24, 2020

***CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY***

## § 989. Prohibited Hazardous Substances/Use of Products

No establishment or school shall:

**(a)** Have on the premises cosmetic products containing hazardous substances banned by the U.S. Food and Drug Administration for use in cosmetic products.

**(b)** Have on the premises methyl methacrylate monomer and/or methylene chloride.

**(c)** Use a product in a manner that is disapproved by the FDA, Occupational Safety and Health Administration or EPA.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

1. New section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 84, No. 28.

2. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

End of Document

*16 CCR 989.5*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 989.5. Change in Location of a School. [Repealed]

## History

HISTORY:

1. New section filed 10-8-70; effective thirtieth day thereafter (Register 70, No. 41).

2. Repealer filed 10-24-94; operative 11-23-94 (Register 94, No. 43).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 990*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY*

## § 990. Headrests, Shampoo Trays and Bowls, and Treatment Tables

**(a)** The headrest of chairs shall be covered with a clean towel or paper sheet for each client.

**(b)** Shampoo trays and bowls must be cleansed with soap and water or other detergent after each shampoo, kept in good repair and in a sanitary condition at all times.

**(c)** Treatment tables must be covered with either clean treatment table paper, a clean towel or a clean sheet, after each use. After a towel or sheet has been used once, it shall immediately be removed from the treatment table and be deposited in a closed container and not used again until it has been properly laundered and sanitized. Treatment table paper shall be immediately disposed of after a single use.

## Statutory Authority

### AUTHORITY:

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

### HISTORY:

1. New section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 93, No. 26.

2. Amendment of section heading and section filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

## *16 CCR 990.5*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 990.5. Delinquent Renewal Fees. [Repealed]

## Statutory Authority

### AUTHORITY:

Note: Authority cited: *Sections 7310 and 7321.1, Business and Professions Code*. Reference: Sections 135, 163.5, and Division 1.5 (Section 475, et seq.), Business and Professions Code.

## History

### HISTORY:

1. New section filed 4-2-75 as an emergency; effective upon filing (Register 75, No. 14).

2. Certificate of Compliance filed 5-22-75 (Register 75, No. 21).

3. Repealer filed 6-29-78; effective thirtieth day thereafter (Register 78, No. 26).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 991*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 991. Invasive Procedures

**(a)**  No licensee or student may use a product, device, machine, or other technique or combination of the same, which results in the removal, destruction, incision, or piercing of a client's skin beyond the epidermis. Any such act shall be considered an invasive procedure.

**(b)**  Invasive procedures include, but are not limited to, the following:

**(1)**  Application of electricity which visibly contracts the muscle.

**(2)**  Application of topical lotions, creams, serums or other substances which require a medical license to purchase.

**(3)**  Penetration of the skin by metal needles, except electrolysis needles/wire filaments.

**(4)**  Abrasion and/or exfoliation of the skin below the epidermal layers.

**(5)**  Removal of skin by means of a razor-edged tool or similar device.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Sections 7312(e), 7316, 7320, 7320.1, Business and Professions Code*.

## History

**HISTORY:**

1. New section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 84, No. 28.

2. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

16 CCR 991

Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 992*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 992. Skin Exfoliation

**(a)**  Only the upper layer of the skin, known as the epidermis, may, by any method or means, be removed, and then only for the purpose of improving the appearance of the skin.

**(b)**  Skin removal techniques and practices which result in destruction of living tissue beyond the epidermal layer of the skin is prohibited.

**(c)**  Only over-the-counter products that are not sold for physician's use only may be used for the purpose of skin exfoliation.

**(d)**  All skin exfoliation products must be applied using the manufacturer's instructions for consumer health and safety.

## Statutory Authority

**AUTHORITY:**

 Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Sections 7312(e), 7316, and 7320, Business and Professions Code*.

## History

**HISTORY:**

 1. Repealer and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 81, No. 11.

 2. Amendment filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

## *16 CCR 993*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 993. Prohibited Tools.

**(a)** No establishment or school shall have on the premises or use any razor-edged tool for the purpose of removing calluses or other similar procedures.

**(b)** No establishment or school shall have on the premises or use any needle-like tool used for the purpose of extracting skin blemishes and other similar procedures.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Sections 7312(e), 7320, and 7320.1, Business and Professions Code*.

## History

**HISTORY:**

1. Repealer and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 75, No. 21.

2. Amendment of section heading and section filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

## *16 CCR 994*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations > TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS > DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY > ARTICLE 12. HEALTH AND SAFETY*

## § 994. Cleanliness and Repair

**(a)** Establishments and schools shall keep the floors, walls, woodwork, ceilings, furniture, furnishing, and fixtures clean and in good repair.

**(b)** No establishment or school shall permit an accumulation of waste, hair clippings or refuse.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e), Business and Professions Code*.

## History

**HISTORY:**

1. Repealer and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 87, No. 33.

2. Amendment of subsection (b) filed 3-26-2015; operative 7-1-2015 (Register 2015, No. 13).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 995*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

## § 995. Building Standards

**(a)**  Establishments and schools shall have a system of adequate ventilation in accordance with Part 2, Section 1203, Title 24, California Code of Regulations.

**(b)**  A supply of hot and cold running water shall be provided in accordance with Part 5, Section 601.3.1, Title 24, California Code of Regulations.

**(c)**  Establishments and schools shall supply potable drinking water in accordance with Part 5, Section 601.3.3, Title 24, California Code of Regulations.

**(d)**  Establishments and schools shall provide hand washing facilities in accordance with Part 5, Section 601.3.2, Title 24, California Code of Regulations.

**(e)**  Establishments and schools shall provide public toilet rooms in accordance with Part 5, Sections 422.6, 422.7, and Table No. 422.1, Title 24, California Code of Regulations.

## Statutory Authority

**AUTHORITY:**

 Note: Authority cited: *Section 7312, Business and Professions Code*. Reference: *Section 7312(e) and 7352, Business and Professions Code*.

## History

**HISTORY:**

 1. Repealer and new section filed 10-24-94; operative 11-23-94 (Register 94, No. 43). For prior history, see Register 88, No. 46.

 2. Change without regulatory effect amending section filed 8-5-2009 pursuant to *section 100, title 1, California Code of Regulations* (Register 2009, No. 32).

 3. Change without regulatory effect amending subsection (e) filed 8-18-2011 pursuant to *section 100, title 1, California Code of Regulations* (Register 2011, No. 18).

16 CCR 995

4. Change without regulatory effect amending subsections (b)-(e) filed 1-11-2016 pursuant to *section 100, title 1, California Code of Regulations* (Register 2016, No. 3).

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Copyright © 2020by Barclays Law Publishers All rights reserved

**End of Document**

## *16 CCR 998*

This document is current through Register 2020, No. 17, April 24, 2020

*CA - Barclays Official California Code of Regulations  >  TITLE 16. PROFESSIONAL AND VOCATIONAL REGULATIONS  >  DIVISION 9. BOARD OF BARBERING AND COSMETOLOGY  >  ARTICLE 12. HEALTH AND SAFETY*

# § 998. Schedule of Fees

The following fees shall be charged by the board:

(a) Barbers:

| | |
|---|---|
| (1) Preapplication fee........................ | 9 |
| (2) Application and examination fee............ | 75 |
| (3) Initial license fee........................ | 50 |
| (4) License renewal fee........................ | 50n1 |
| (5) License renewal delinquency fee............ | 25n1 |

(b) Cosmetologists:

| | |
|---|---|
| (1) Preapplication fee........................ | 9 |
| (2) Application and examination fee............ | 75 |
| (3) Initial license fee........................ | 50 |
| (4) License renewal fee........................ | 50n1 |
| (5) License renewal delinquency fee............ | 25n1 |

(c) Estheticians:

| | |
|---|---|
| (1) Preapplication fee........................ | 9 |
| (2) Application and examination fee............ | 75 |
| (3) Initial license fee........................ | 40 |
| (4) License renewal fee........................ | 50n1 |
| (5) License renewal delinquency fee............ | 25n1 |

(d) Manicurists:

| | |
|---|---|
| (1) Preapplication fee........................ | 9 |
| (2) Application and examination fee............ | 75 |
| (3) Initial license fee........................ | 35 |
| (4) License renewal fee........................ | 50n1 |
| (5) License renewal delinquency fee............ | 25n1 |

(e) Electrologists:

16 CCR 998

| | |
|---|---|
| (1) Preapplication fee........................ | 9 |
| (2) Application and examination fee............ | 75 |
| (3) Initial license fee........................ | 50 |
| (4) License renewal fee........................ | 50n1 |
| (5) License renewal delinquency fee............ | 25n1 |
| (f) Apprentice application and license fee<2>.... | 25 |
| (g) Establishments: | |
| (1) Application and initial license fee........ | 50 |
| (2) License renewal fee........................ | 40 |
| (3) License renewal delinquency fee............ | 20 |
| (h) Mobile Units: | |
| (1) Application fee............................ | 50 |
| (2) Initial inspection and license fee......... | 100 |
| (3) License renewal fee........................ | 40 |
| (4) License renewal delinquency fee............ | 20 |

---------

n1Fees effective for all licenses expiring on or after December 21, 2007.

n2Licenses of apprentices are not renewable.

## Statutory Authority

**AUTHORITY:**

Note: Authority cited: Sections *7312*, *7337.5(b)* and *7421, Business and Professions Code*. Reference: Sections *7415*, *7417*, *7418*, *7420*, *7423*, *7424* and *7425, Business and Professions Code*.

## History

**HISTORY:**

1. New section filed 6-22-93; operative 6-22-93 pursuant to *Government Code section 11346.2(d)* (Register 93, No. 26).

2. Amendment filed 11-21-2007; operative 12-21-2007 (Register 2007, No. 47).

3. Change without regulatory effect repealing subsections (f)-(g)(3) and relettering subsections filed 3-4-2009 pursuant to *section 100, title 1, California Code of Regulations* (Register 2009, No. 10).

16 CCR 998

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2020by Barclays Law Publishers All rights reserved

---

**End of Document**

# EXHIBIT 6

**From:** "Barbercosmo2@DCA" <Barbercosmo2@dca.ca.gov>
**Date:** May 4, 2020 at 3:56:32 PM PDT
**To:** "Corinne @SalottoBlowdry" <corinne@salottoblowdry.com>
**Subject: RE:  Why isn't our board offering us adaptations to our guidelines?**


The Board understands and is sympathetic to the desire that many of our licensees have to return to work. However, we highly recommend that everyone follow the Governor's order to shelter in place and follow your local health department's guidance.
The Board's role is to protect consumers. We do this by licensing and enforcement of the profession.

Industry Associations are intended to promote the interest of its members and advocate on their behalf. The Board recommends that you reach out to your industry associations for additional guidance during this time.

Sincerely,

Board of Barbering and Cosmetology


**From:** Corinne @SalottoBlowdry <corinne@salottoblowdry.com>
**Sent:** Saturday, May 2, 2020 9:07 AM
**To:** BPPE@DCA <BPPE@dca.ca.gov>
**Subject:** Why isn't our board offering us adaptations to our guidelines?

[EXTERNAL]: corinne@salottoblowdry.com

CAUTION: THIS EMAIL ORIGINATED OUTSIDE THE DEPARTMENT OF CONSUMER AFFAIRS!
DO NOT: click links or open attachments unless you know the content is safe.
NEVER: provide credentials on websites via a clicked link in an Email.


I am a salon owner and hairstylist. In the state of California, my home state, I have been licensed and working, as a professional cosmetologist for the past 15 years. When I made the decision to attend beauty school, I was excited to learn the many facets of the beauty industry. To my surprise, the MAJORITY of my 1600 hours of training consisted of health, safety and sanitation. The testing to receive my license wasn't to make sure I knew how to cut a straight line (true story!), but to make sure I upheld the healthy, safety and sanitation guidelines that were set in school. Because of this prioritization in our industry's licensing, I employ newly licensed cosmetologists that want to learn how to cut to straight line and we continue to be successful in offering a healthy, safe and sanitary salon for our community to enjoy.

Over the past 15 years of being a licensed cosmetologist, I have had several surprise inspections of my salon.  These inspections are organized by my state. The infractions my business may receive are paid to my state. As quoted on page 11 of the 1600 Hour Cosmetology Curriculum Review it states, "...cosmetology schools provide essential skills for safety, sanitation and infection control for all." The Foreward of the same document clarifies that "By using the informations the students acquire from this training course, they will be able to follow safe practices at work and hopefully have a long and healthful career".  To that point, Governor, my salon has always evolved with the needs of our clients and the laws that our business is mandated by. We have changed the structure of how we pay our staff when the Independent Contractor laws changed and as of late, we have gone as far as to change the layout of our salon to accommodate for social distancing, investing money that we are no longer generating to make sure our staff and our patrons are safe. Because that is what we do, as small business owners and as licensed cosmetologists.

I urge you to educate yourself, your staff and most importantly, our state, of the laws our cosmetologists are continuously mandated to uphold. We do not belong in a re-opening phase that includes movie theaters.  The people I employ are driven and inspired by our small business's willingness to adapt to all uncertain times that arise, Covid-19 included. Our clients have expressed their deepest concerns for our business and salon family's wellness as our doors continue to remain shut.  Nurses and doctors have reached out to us in desperation for much needed maintenance that will eases their routines each day/night that they return home from the front-lines.

We are not your beauty school drop outs.  We are business owners, therapists, artists, we take our jobs seriously and as seriously fun.  Please reconsider the positive implications that will come from our patrons' ability to return to a visible sense of "normal".  Of all of the industry's that you have to consider in how you begin advancing our economy, the beauty industry is one that you should have some sense of ease in knowing they will handle the circumstances with the utmost care and concern for the health, safety and sanitation for all.

Corinne Lam, Salotto Salon & Blowdry Lounge in San Diego, CA


Corinne Lam

EXHIBIT 7



# Office of the Attorney General
## Washington, D. C. 20530

April 27, 2020

MEMORANDUM FOR THE ASSISTANT ATTORNEY GENERAL FOR CIVIL RIGHTS AND ALL UNITED STATES ATTORNEYS

FROM:               THE ATTORNEY GENERAL

SUBJECT:            <u>Balancing Public Safety with the Preservation of Civil Rights</u>

    The current national crisis related to COVID-19 has required the imposition of extraordinary restrictions on all of our daily lives. Millions of Americans across the nation have been ordered to stay in their homes, leaving only for essential and necessary reasons, while countless businesses and other gathering places have been ordered to close their doors indefinitely. These kinds of restrictions have been necessary in order to stop the spread of a deadly disease—but there is no denying that they have imposed tremendous burdens on the daily lives of all Americans.

    In prior Memoranda, I directed our prosecutors to prioritize cases against those seeking to illicitly profit from the pandemic, either by hoarding scarce medical resources to sell them for extortionate prices, or by defrauding people who are already in dire circumstances due to the severe problems the pandemic has caused. We have pursued those efforts vigorously and will continue to do so. Now, I am directing each of our United States Attorneys to also be on the lookout for state and local directives that could be violating the constitutional rights and civil liberties of individual citizens.

    As the Department of Justice explained recently in guidance to states and localities taking steps to battle the pandemic, even in times of emergency, when reasonable and temporary restrictions are placed on rights, the First Amendment and federal statutory law prohibit discrimination against religious institutions and religious believers. The legal restrictions on state and local authority are not limited to discrimination against religious institutions and religious believers. For example, the Constitution also forbids, in certain circumstances, discrimination against disfavored speech and undue interference with the national economy. If a state or local ordinance crosses the line from an appropriate exercise of authority to stop the spread of COVID-19 into an overbearing infringement of constitutional and statutory protections, the Department of Justice may have an obligation to address that overreach in federal court.

    I am therefore directing the Assistant Attorney General for Civil Rights, Eric Dreiband, and Matthew Schneider, the U.S. Attorney for the Eastern District of Michigan, to oversee and coordinate our efforts to monitor state and local policies and, if necessary, take action to correct them. They should work not only with all Department of Justice offices and other federal agencies, but with state and local officials as well.

Memorandum from the Attorney General                                      Page 2
Subject: Balancing Public Safety with the Preservation of Civil Rights

     Many policies that would be unthinkable in regular times have become commonplace in recent weeks, and we do not want to unduly interfere with the important efforts of state and local officials to protect the public.  But the Constitution is not suspended in times of crisis.  We must therefore be vigilant to ensure its protections are preserved, at the same time that the public is protected.

     I thank you for your attention to this important initiative and for your service to our country.